# TRUPIANO ET AL. *v.* UNITED STATES.

No. 427.   Argued March 9, 1948.—Decided June 14, 1948.

*Frank G. Schlosser* argued the cause for petitioners. With him on the brief was *Anthony A. Calandra.*

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General Quinn, Robert S. Erdahl* and *Beatrice Rosenberg.*

MR. JUSTICE MURPHY delivered the opinion of the Court.

This case adds another chapter to the body of law growing out of the Fourth Amendment to the Constitution of the United States. That Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In other words, the Fourth Amendment is a recognition of the fact that in this nation individual liberty depends in large part upon freedom from unreasonable intrusion by those in authority. It is the duty of this Court to give effect to that freedom.

In January, 1946, the petitioners sought to lease part of the Kell farm in Monmouth County, New Jersey, and to erect a building thereon. Kell suspected that they intended to build and operate an illegal still. He accordingly reported the matter to the appropriate federal authority, the Alcohol Tax Unit of the Bureau of Internal Revenue. The federal agents told Kell to accept the proposition, provided he did nothing to entice or encourage the petitioners into going ahead with their plans and provided he kept the agents informed of all developments. Nilsen, one of the agents, was assigned in February to work on the farm in the disguise of a "dumb farm hand" and to accept work at the still if petitioners should offer it.

Toward the end of March, 1946, Kell agreed with petitioners to let them rent part of his farm for $300 a month. Kell and Nilsen assisted petitioners in the erection of the building, a roughly constructed barn about 200 yards from the Kell farmhouse. Nilsen also assisted in the erection of the still and the vats.

Operation of the still began about May 13, 1946. Nilsen thereafter worked as "mash man" at a salary of $100 a week, which he turned over to the Government. During this period he was in constant communication with his fellow agents. By prearrangement, he would meet one or more of the agents at various places within a few miles of the Kell farm; at these meetings "the conversation would be about the still building I had assisted in erecting or about the illicit distillery that I was working at on the Kell farm." On May 20 he met with one of his superior officers and gave him samples of alcohol, several sugar bags, a yeast wrapper and an empty five-gallon can which had been taken from the still premises.

On May 26 Nilsen received a two-way portable radio set from his superiors. He used this set to transmit frequent bulletins on the activities of the petitioners. On

the basis of radio intelligence supplied by Nilsen, a truck-load of alcohol was seized on May 31 about an hour after it had left the farm.

At about 9 p. m. in the evening of June 3, 1946, Nilsen radioed his superior that the still operators were awaiting the arrival of a load of sugar and that alcohol was to be taken from the farm when the sugar truck arrived. Nilsen apparently knew then that a raid was scheduled for that night, for he told Kell during the evening that "tonight is the night." He radioed at 11 p. m. that the truck had been delayed but that petitioners Roett and Antoniole were at the still.

Three federal agents then drove to within three miles of the farm, at which point they were met by Kell. The remainder of the distance was traversed in Kell's automobile. They arrived at the farm at about 11:45 p. m. The agents stated that the odor of fermenting mash and the sound of a gasoline motor were noticeable as the car was driven onto the farm premises; the odor became stronger and the noise louder as they alighted from the car and approached the building containing the still. Van De Car, one of the agents, went around one end of the building. Looking through an open door into a dimly lighted interior he could see a still column, a boiler and a gasoline pump in operation. He also saw Antoniole bending down near the pump. He entered the building and placed Antoniole under arrest. Thereupon he "seized the illicit distillery."

After this arrest and seizure, Van De Car looked about further and observed a large number of five-gallon cans which he later found to contain alcohol and some vats which contained fermenting mash. Another agent, Casey, testified that he could see several of these cans through the open door before he entered; he subsequently counted the cans and found that there were 262 of them. After he entered he saw the remainder of the distillery

equipment, including four large mash vats. The third agent, Gettel, proceeded to a small truck standing in the yard and "searched it thoroughly for papers and things of an evidentiary nature." It does not appear whether he was successful in his search or whether he took anything from the truck.

A few minutes later Roett was arrested outside the building. Petitioners Trupiano and Riccardelli apparently were arrested later that night by other agents, the place and the circumstances not being revealed by the record before us. In addition, three other persons were arrested that night because of their connections with the illegal operations; one of them, who was unknown to Nilsen, was arrested when he arrived at the farm with a truck loaded with coke.

The agents engaged in this raid without securing a search warrant or warrants of arrest. It is undenied that they had more than adequate opportunity to obtain such warrants before the raid occurred, various federal judges and commissioners being readily available.

All of the persons arrested were charged with various violations of the Internal Revenue Code arising out of their ownership and operation of the distillery. Prior to the return of an indictment against them, the four petitioners filed in the District Court for the District of New Jersey a motion alleging that the federal agents had illegally seized "a still, alcohol, mash and other equipment," and asking that "all such evidence" be excluded and suppressed at any trial and that "all of the aforesaid property" be returned. The District Court denied the motion after a hearing, holding that the seizure was reasonable and hence constitutional. 70 F. Supp. 764. The Circuit Court of Appeals for the Third Circuit affirmed *per curiam* the order of the District Court. 163 F. 2d 828.

Thus we have a case where contraband property was seized by federal agents without a search warrant under

circumstances where such a warrant could easily have been obtained. The Government, however, claims that the failure to secure the warrant has no effect upon the validity of the seizure. Reference is made to the well established right of law enforcement officers to arrest without a warrant for a felony committed in their presence, *Carroll* v. *United States,* 267 U. S. 132, 156–157, a right said to be unaffected by the fact that there may have been adequate time to procure a warrant of arrest. Since one of the petitioners, Antoniole, was arrested while engaged in operating an illegal still in the presence of agents of the Alcohol Tax Unit, his arrest was valid under this view even though it occurred without the benefit of a warrant. And since this arrest was valid, the argument is made that the seizure of the contraband open to view at the time of the arrest was also lawful. Reliance is here placed on the long line of cases recognizing that an arresting officer may look around at the time of the arrest and seize those fruits and evidences of crime or those contraband articles which are in plain sight and in his immediate and discernible presence. *Weeks* v. *United States,* 232 U. S. 383, 392; *Carroll* v. *United States, supra,* 158; *Agnello* v. *United States,* 269 U. S. 20, 30; *United States* v. *Lee,* 274 U. S. 559, 563; *Marron* v. *United States,* 275 U. S. 192, 198–199; *Go-Bart Co.* v. *United States,* 282 U. S. 344, 358; *United States* v. *Lefkowitz,* 285 U. S. 452, 465; *Harris* v. *United States,* 331 U. S. 145, 150–151.

We sustain the Government's contention that the arrest of Antoniole was valid. The federal agents had more than adequate cause, based upon the information supplied by Nilsen, to suspect that Antoniole was engaged in felonious activities on the farm premises. Acting on that suspicion, the agents went to the farm and entered onto the premises with the consent of Kell, the owner. There Antoniole was seen through an open doorway by one of the agents to be operating an illegal still, an act

felonious in nature. His arrest was therefore valid on the theory that he was committing a felony in the discernible presence of an agent of the Alcohol Tax Unit, a peace officer of the United States. The absence of a warrant of arrest, even though there was sufficient time to obtain one, does not destroy the validity of an arrest under these circumstances. Warrants of arrest are designed to meet the dangers of unlimited and unreasonable arrests of persons who are not at the moment committing any crime. Those dangers, obviously, are not present where a felony plainly occurs before the eyes of an officer of the law at a place where he is lawfully present. Common sense then dictates that an arrest in that situation is valid despite the failure to obtain a warrant of arrest.

But we cannot agree that the seizure of the contraband property was made in conformity with the requirements of the Fourth Amendment. It is a cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants wherever reasonably practicable. *Carroll* v. *United States, supra,* 156; *Go-Bart Co.* v. *United States, supra,* 358; *Taylor* v. *United States,* 286 U. S. 1, 6; *Johnson* v. *United States,* 333 U. S. 10, 14–15. This rule rests upon the desirability of having magistrates rather than police officers determine when searches and seizures are permissible and what limitations should be placed upon such activities. *United States* v. *Lefkowitz, supra,* 464. In their understandable zeal to ferret out crime and in the excitement of the capture of a suspected person, officers are less likely to possess the detachment and neutrality with which the constitutional rights of the suspect must be viewed. To provide the necessary security against unreasonable intrusions upon the private lives of individuals, the framers of the Fourth Amendment required adherence to judicial processes wherever possible. And subsequent history has confirmed the wisdom of that requirement.

The facts of this case do not measure up to the foregoing standard. The agents of the Alcohol Tax Unit knew every detail of the construction and operation of the illegal distillery long before the raid was made. One of them was assigned to work on the farm along with the illicit operators, making it possible for him to secure and report the minutest facts. In cooperation with the farm owner, who served as an informer, this agent was in a position to supply information which could easily have formed the basis for a detailed and effective search warrant. Concededly, there was an abundance of time during which such a warrant could have been secured, even on the night of the raid after the odor and noise of the distillery confirmed their expectations. And the property was not of a type that could have been dismantled and removed before the agents had time to secure a warrant; especially is this so since one of them was on hand at all times to report and guard against such a move. See *United States* v. *Kaplan,* 89 F. 2d 869, 871.

What was said in *Johnson* v. *United States, supra,* 15, is equally applicable here: "No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. . . . If the officers in this case were excused from the constitutional duty of presenting their evidence to a magistrate, it is difficult to think of a case in which it should be required."

And so when the agents of the Alcohol Tax Unit decided to dispense with a search warrant and to take matters into their own hands, they did precisely what the Fourth Amendment was designed to outlaw. Uninhibited by any limitations that might have been contained in a warrant, they descended upon the distillery in a mid-

night raid. Nothing circumscribed their activities on that raid except their own good senses, which the authors of the Amendment deemed insufficient to justify a search or seizure except in exceptional circumstances not here present. The limitless possibilities afforded by the absence of a warrant were epitomized by the one agent who admitted searching "thoroughly" a small truck parked in the farmyard for items of an evidentiary character. The fact that they actually seized only contraband property, which would doubtless have been described in a warrant had one been issued, does not detract from the illegality of the seizure. See *Amos* v. *United States,* 255 U. S. 313; *Byars* v. *United States,* 273 U. S. 28; *Taylor* v. *United States, supra.*

Moreover, the proximity of the contraband property to the person of Antoniole at the moment of his arrest was a fortuitous circumstance which was inadequate to legalize the seizure. As we have seen, the existence of this property and the desirability of seizing it were known to the agents long before the seizure and formed one of the main purposes of the raid. Likewise, the arrest of Antoniole and the other petitioners in connection with the illicit operations was a foreseeable event motivating the raid. But the precise location of the petitioners at the time of their arrest had no relation to the foreseeability or necessity of the seizure. The practicability of obtaining a search warrant did not turn upon whether Antoniole and the others were within the distillery building when arrested or upon whether they were then engaged in operating the illicit equipment. Antoniole just happened to be working amid the contraband surroundings at 11:45 p. m. on the night in question, while the other three petitioners chanced to be some place else. But Antoniole might well have been outside the building at that particular time. If that had been the case and he had been arrested in the farmyard, the entire argument advanced

by the Government in support of the seizure without warrant would collapse. We do not believe that the applicability of the Fourth Amendment to the facts of this case depends upon such a fortuitous factor as the precise location of Antoniole at the time of the raid.

In other words, the presence or absence of an arrestee at the exact time and place of a foreseeable and anticipated seizure does not determine the validity of that seizure if it occurs without a warrant. Rather the test is the apparent need for summary seizure, a test which clearly is not satisfied by the facts before us.

A search or seizure without a warrant as an incident to a lawful arrest has always been considered to be a strictly limited right. It grows out of the inherent necessities of the situation at the time of the arrest. But there must be something more in the way of necessity than merely a lawful arrest. The mere fact that there is a valid arrest does not *ipso facto* legalize a search or seizure without a warrant. *Carroll* v. *United States, supra,* 158. Otherwise the exception swallows the general principle, making a search warrant completely unnecessary wherever there is a lawful arrest. And so there must be some other factor in the situation that would make it unreasonable or impracticable to require the arresting officer to equip himself with a search warrant. In the case before us, however, no reason whatever has been shown why the arresting officers could not have armed themselves during all the weeks of their surveillance of the locus with a duly obtained search warrant—no reason, that is, except indifference to the legal process for search and seizure which the Constitution contemplated.

We do not take occasion here to reexamine the situation involved in *Harris* v. *United States, supra.* The instant case relates only to the seizure of contraband the existence and precise nature and location of which the law enforcement officers were aware long before making the lawful arrest. That circumstance was wholly lacking in the

*Harris* case, which was concerned with the permissible scope of a general search without a warrant as an incident to a lawful arrest. Moreover, the *Harris* case dealt with the seizure of Government property which could not have been the subject of a prior search warrant, it having been found unexpectedly during the course of a search. In contrast, the contraband seized in this case could easily have been specified in a prior search warrant. These factual differences may or may not be of significance so far as general principles are concerned. But the differences are enough to justify confining ourselves to the precise facts of this case, leaving it to another day to test the *Harris* situation by the rule that search warrants are to be obtained and used wherever reasonably practicable.

What we have here is a set of facts governed by a principle indistinguishable from that recognized and applied in *Taylor* v. *United States, supra.* The Court there held that the seizure of illicit whiskey was unreasonable, however well-grounded the suspicions of the federal agents, where there was an abundant opportunity to obtain a search warrant and to proceed in an orderly, judicial way. True, the *Taylor* case did not involve a seizure in connection with an arrest. And the officers there made an unlawful entry onto the premises. But those factors had no relation to the practicability of obtaining a search warrant before making the seizure. It was the time element and the foreseeability of the need for a search and seizure that made the warrant essential. The *Taylor* case accordingly makes plain the illegality of the seizure in the instant proceeding.

The Fourth Amendment was designed to protect both the innocent and the guilty from unreasonable intrusions upon their right of privacy while leaving adequate room for the necessary processes of law enforcement. The people of the United States insisted on writing the Fourth Amendment into the Constitution because sad experience had taught them that the right to search and

seize should not be left to the mere discretion of the police, but should as a matter of principle be subjected to the requirement of previous judicial sanction wherever possible. The effective operation of government, however, could hardly be embarrassed by the requirement that arresting officers who have three weeks or more within which to secure the authorization of judicial authority for making search and seizure should secure such authority and not be left to their own discretion as to what is to be searched and what is to be seized. Such a requirement partakes of the very essence of the orderly and effective administration of the law.

It is a mistake to assume that a search warrant in these circumstances would contribute nothing to the preservation of the rights protected by the Fourth Amendment. A search warrant must describe with particularity the place to be searched and the things to be seized. Without such a warrant, however, officers are free to determine for themselves the extent of their search and the precise objects to be seized. This is no small difference. It is a difference upon which depends much of the potency of the right of privacy. And it is a difference that must be preserved even where contraband articles are seized in connection with a valid arrest.

It follows that it was error to refuse petitioners' motion to exclude and suppress the property which was improperly seized. But since this property was contraband, they have no right to have it returned to them.

*Reversed.*

Mr. Chief Justice Vinson, with whom Mr. Justice Black, Mr. Justice Reed and Mr. Justice Burton concur, dissenting.

Federal officers, following a lawful arrest, seized contraband materials which were being employed in open view in violation and defiance of the laws of the land.

Today, the Court for the first time has branded such a seizure illegal.  Nothing in the explicit language of the Fourth Amendment dictates that result.  Nor is that holding supported by any decision of this Court.

The material facts are not in dispute.  In January, 1946, certain of the petitioners approached one Kell offering to rent a portion of the latter's farm on which a building was to be erected.  His suspicions aroused, Kell reported the matter to agents of the Alcohol Tax Unit of the Bureau of Internal Revenue.  He was advised that the offer could be accepted provided that nothing was done to entice petitioners into completion of their plans.  An agent, Nilsen, was assigned to the farm to act the part of a farm hand in the employ of Kell.

Ultimately, an agreement was entered into whereby Kell rented a portion of his farm to petitioners at $300 a month.  Petitioners, with the assistance of Kell and Nilsen, constructed a barn-like structure some two hundred yards from the farmhouse.  A still and vats were installed.  After the still began operation, Nilsen acted as a "mash man" receiving a salary of $100 a week from petitioners.  All sums received by Nilsen were turned over to the Federal Government.

Throughout this period, Nilsen reported regularly to his superiors.  As a result of this information, federal agents on May 31, 1946, seized a truckload of alcohol about an hour after it had left the Kell farm.

The night of June 3, 1946, was chosen by the agents to conduct their raid.  Kell cooperated fully with the officers and drove three of the agents to the farm in his own car.  As the car entered the farm premises, the odor of fermenting mash and the sound of a gasoline motor became apparent.  When the agents alighted from the car it was obvious that the sound and the odor were emanating from the building in which the still was located.  One of the agents approached the structure and through an

open door observed a still and a boiler. He also saw the petitioner Antoniole bending over a gasoline pump. The agent entered the building and placed Antoniole under arrest on the theory that a crime was being committed in his presence. Subsequently, the agent seized the still, mash vats containing fermenting mash, other distillery equipment, and 262 five-gallon cans containing illicit alcohol. Neither the arrest nor the seizure was effected under the authority of a warrant. Later six other persons were arrested, including three of the petitioners in this case.[1]

There can be no doubt that the activities of petitioners were in flagrant violation of the laws of the United States.[2] It is clear, also, that the materials seized consisted of instrumentalities used by petitioners in their criminal enterprise and contraband goods, possession of which is a crime. The materials and objects falling into the control of the federal agents, therefore, were of the type properly subject to lawful seizure.[3]

Further, it is obvious that entry of the federal agents onto the farm premises was in no sense trespassory or otherwise illegal. *Amos* v. *United States,* 255 U. S. 313 (1921); *Byars* v. *United States,* 273 U. S. 28 (1927).

---

[1] Subsequently, petitioners moved the District Court to order the return of the property seized and to suppress its use as evidence. 70 F. Supp. 764 (1947). The motion was denied. The order was affirmed by the Circuit Court of Appeals in a *per curiam* statement. 163 F. 2d 828 (1947).

[2] See §§ 2803, 2810, 2812, 2814, 2831, 2833 of the Internal Revenue Code.

[3] *Boyd* v. *United States,* 116 U. S. 616, 623, 624 (1886); *Weeks* v. *United States,* 232 U. S. 383, 392–393 (1914); *Gouled* v. *United States,* 255 U. S. 298, 309 (1921); *Carroll* v. *United States,* 267 U. S. 132, 149–150 (1925); *Agnello* v. *United States,* 269 U. S. 20, 30 (1925); *Marron* v. *United States,* 275 U. S. 192, 199 (1927); *United States* v. *Lefkowitz,* 285 U. S. 452, 465–466 (1932); *Harris* v. *United States,* 331 U. S. 145, 154 (1947).

Kell, the owner of the farm, gave his active consent to the entry. Indeed, he voluntarily drove three of the agents to the premises in his own car.

Nor can there be doubt that the arrest of the petitioner Antoniole while engaged in the commission of a felony in the presence of the agent was a valid arrest. The majority of the Court explicitly concedes such to be the fact. Under the English common law, a police officer had power without a warrant to arrest persons committing a misdemeanor in the officer's presence and persons whom the officer had reasonable cause to believe had committed a felony. This rule, which had its origin in the ancient formative period of the common law, was firmly established at the time of the adoption of the Fourth Amendment.[4] Since that time it has received general application by state and federal courts.[5] Indeed, this Court has heretofore given specific recognition to the rule. *Carroll* v. *United States,* 267 U. S. 132, 156–157 (1925).[6]

Thus, even though agents charged with enforcement of the laws of the United States made a lawful entry onto the farm and despite the fact that a valid arrest was made of a party who was in the act of committing a felony, the Court now holds that the arresting officer in the absence of a search warrant was powerless to make a valid seizure of contraband materials located in plain sight in the structure in which the arrest took place. And this despite the long line of decisions in this Court recognizing as consistent with the restrictions of the Fourth Amendment the power of law-enforcement officers

---

[4] *Samuel* v. *Payne,* 1 Doug. K. B. 359 (1780); *Wakely* v. *Hart,* 6 Binn. 316 (1814). And see 2 Hale, Pleas of the Crown 85–97; 4 Blackstone, Commentaries 292–293; Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 673.

[5] *United States* v. *Daison,* 288 F. 199 (1923); *Rohan* v. *Sawin,* 5 Cush. 281 (1850); *Wade* v. *Chaffee,* 8 R. I. 224 (1865).

[6] Cf. *Kurtz* v. *Moffitt,* 115 U. S. 487, 498–499 (1855).

to make reasonable searches and seizures as incidents to lawful arrests.

In *Agnello* v. *United States,* 269 U. S. 20, 30 (1925), this Court stated: "The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime . . . as well as weapons and other things to effect an escape from custody, is not to be doubted. . . . Such searches and seizures naturally and usually appertain to and attend such arrests." [7]   And see *Weeks* v. *United States,* 232 U. S. 383, 392 (1914) ; *Carroll* v. *United States, supra* at 158; *United States* v. *Lee,* 274 U. S. 559, 563 (1927) ; *Marron* v. *United States,* 275 U. S. 192, 198– 199 (1927) ; *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344, 358 (1931); *United States* v. *Lefkowitz,* 285 U. S. 452, 465 (1932) ; *Harris* v. *United States,* 331 U. S. 145, 150–151, 168, 186 (1947).

The validity of a search and seizure as incident to a lawful arrest has been based upon a recognition by this Court that where law-enforcement agents have lawfully gained entrance into premises and have executed a valid arrest of the occupant, the vital rights of privacy protected by the Fourth Amendment are not denied by seizure of contraband materials and instrumentalities of crime in open view or such as may be brought to light by a reasonable search.   Here there can be no objection to the scope or intensity of the search.   Cf. *Marron* v. *United States, supra; Go-Bart Importing Co.* v. *United States, supra; United States* v. *Lefkowitz, supra; Harris* v. *United States, supra.*   The seizure was not preceded by an exploratory search.   The objects seized were in plain sight.   To insist upon the use of a search warrant in situations where the issuance of such a warrant can contribute nothing to the preservation of the rights which

---

[7] And see *id.* at 32, 33.

the Fourth Amendment was intended to protect, serves only to open an avenue of escape for those guilty of crime and to menace the effective operation of government which is an essential precondition to the existence of all civil liberties.

In reaching its result the Court relies on *Taylor* v. *United States,* 286 U. S. 1 (1932). There, federal agents broke into a garage and seized a quantity of illicit liquor. At the time of entry, "No one was within the place and there was no reason to think otherwise." *Id.* at 5. The agents acted without the authority of a search warrant, nor, unlike the present case, was lawful entry into the building made for the purpose of effecting a valid arrest. Under these circumstances the Court ruled that the seizure was unlawful. But to apply that holding in a situation like the present, where law-enforcement officers have entered a building to arrest a party openly engaged in the commission of a felony, is to disregard the very basis upon which the *Taylor* case was decided.

We are told, however, that although the petitioner Antoniole was arrested while undeniably engaged in the commission of a felony, his presence in the building in which the contraband materials were located was a "fortuitous circumstance which was inadequate to legalize the seizure." We should suppose that any arrest of a party engaged in the commission of a felony is based in part upon an element of chance. Criminals do not normally choose to engage in felonious enterprises before an audience of police officials. We may well anticipate the perplexity of officers engaged in the practical business of law enforcement when confronted with a rule which makes the validity of a seizure of contraband materials as an incident to a lawful arrest dependent upon subsequent judicial judgment as to the "fortuitous" circumstances relating to the presence of the party arrested on the premises in which the illegal goods are located.

Nor are we free to assume that the agents in this case would have proceeded illegally to seize the materials in the barn in the absence of the justification of a valid arrest. A lawful seizure is not to be invalidated by speculations as to what the conduct of the agents might have been had a different factual situation been presented.

The case of *Johnson* v. *United States,* 333 U. S. 10 (1948), does not support the result which the Court has reached. For there the majority of the Court held that the arrest in question was an invalid one. Obviously, a search and seizure may not be held valid on the sole ground that it was an incident to an invalid arrest. Such is not the situation here.

In *Carroll* v. *United States, supra* at 149, this Court observed: "The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens." We believe that the result reached today is not consistent with judicial authority as it existed before the adoption of the Fourth Amendment nor as it has developed since that time. Nor do we feel that the decision commends itself as adapted to conserve vital public and individual interests. Heretofore it has been thought that where officers charged with the responsibility of enforcement of the law have lawfully entered premises and executed a valid arrest, a reasonable accommodation of the interests of society and the individual permits such officials to seize instrumentalities of the crime and contraband materials in open view of the arresting officer. The Court would now condition this right of seizure after a valid arrest upon an *ex post facto* judicial judgment of whether the arresting officers might have obtained a search warrant. At best, the operation of the rule which the Court today enunciates for the first time may be expected to confound confusion in a field already replete with complexities.