**UNITED STATES v. BAXTER.**

Cr. No. 5415.

United States District Court
E. D. Tennessee. N. E. D.

March 30, 1950.

Otto T. Ault, U. S. Attorney, Chattanooga, Tenn., James M. Meek, Asst. U. S. Attorney, Knoxville, Tenn., for plaintiff.

Hodges & Doughty, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

Defendant has filed his motion for suppression of evidence, for the asserted reason that the evidence obtained was the fruit of an illegal search.

Told in the early afternoon of September 29, 1948, by a person who had given them reliable information on other occasions that defendant was storing whiskey in his house and that automobiles were being used to haul it out at night, two officers of the Alcohol Tax Unit went to defendant's premises that evening to investigate. They arrived at defendant's place, which was in the country, about 8:00 o'clock. Their approach, from the time they left their conveyance, was through a field to a point within two or three feet from a wire fence which separated the field from the dwelling-house yard. Beyond the fence were a driveway, a garage, and defendant's house, the fence being tied to the ends of an outside wall of the garage.

The officers stopped within four or five feet of a corner of the garage. In the field near the yard fence were stalks of a corn-patch and evidences of vegetable rows, indicating that a portion of the field had been used as a garden. The point at which the officers stationed themselves was about twenty-five feet from the house.

When the officers had waited about an hour, an automobile was driven into the driveway, backed into the yard and stopped within three or four feet of the back door of the house. Two men got out of the automobile and entered the dwelling through the back door. When inside the house one of them yelled, "How many cases do you want us to bring up?" To which the defendant Esmond Baxter replied from another part of the house, "Bring it all up." The men made descents to the cellar and returned with fruit jar cases, four of which they had loaded into the trunk of the automobile when the officers climbed the fence and approached them. One of the men, startled at the approach of the officers, dropped a fruit jar case onto a concrete step and broke some of the jars, whereupon the officers detected the odor of whiskey. One man was arrested while packing cases into the trunk of the automobile. The one who had dropped his load turned and fled into the house, taking refuge in the room where defendant Esmond Baxter "was in bed with his family."

Following arrival of the automobile and entry into the house by its occupants, there was a "light on on the back porch." By this light the officers, while still outside the yard, were able to identify the packages as fruit jar cases. They could not see their contents, and one of the officers in testifying admitted that he could not tell whether the cases contained sand or whiskey. Concluding, nevertheless, that a felony was being committed in their presence and that defendant Esmond Baxter was a participant in the crime, one of the officers entered the house and arrested Baxter, as well as the man who had taken flight. No search of the house was made by either of the officers. All of the cases which had been carried up from the cellar were seized and found to contain sixty-six gallons of whiskey in unstamped fruit jars.

The officers had no search warrant and no arrest warrant. Their reason for not having obtained warrants was that they lacked definite knowledge upon which to apply for warrants. Their purpose in going to defendant's place was not to make a search or an arrest, but to investigate the report which the informer had given them. In the transaction they witnessed and the conversation they heard there was a strong suggestion that if they then took time out to go for warrants, the evidence of crime would be gone when they returned. In the situation existed a basis for prompt action comparable to that which has been held to justify search without a warrant of vehicles on highways. Carroll v. United States,

267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302.

If there was an illegal search, it began when the officers went upon the defendant's land and stationed themselves close enough to his dwelling to observe the transaction hereinabove detailed. Defendant invokes the Fourth and Fifth Amendments of the Constitution, particularly the Fourth Amendment, which reads as follows: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

 The right therein described is for convenience called the right of privacy. How broad, in terms of space, is that right?

It is as broad as the concept of reasonableness, which means that it has no fixed bounds, but is broad or narrow as facts and circumstances vary. Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374. An approximate landmark has been set by the decision that the right of privacy does not extend to open fields. Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898. Somewhat more traditional, though still approximate, is the curtilage concept of privacy. While an officer proceeding upon prior information may trespass upon open fields without a search warrant, he may not so trespass upon the curtilage in search of evidence of crime. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191; Roberson v. United States, 6 Cir., 165 F.2d 752; Wakkuri v. United States, 6 Cir., 67 F.2d 844; Schnorenberg v. United States, 7 Cir., 23 F.2d 38; Koth v. United States, 9 Cir., 16 F.2d 59.

When the curtilage concept of privacy was in its formative period, life was largely rural, or semi-rural, and families for protective purposes gathered themselves and their possessions, including livestock, within a common enclosure, or outer wall. Invasion of any part of the enclosure was a threat not only to the security of the possessions, but also to that of the family. As is characteristic of growth and change of the common law, departure from the old idea of what a curtilage encompassed is far from complete. While a shack in a swamp 230 feet from the owner's dwelling is "no part of the curtilage" (Dulek v. United States, 6 Cir., 16 F.2d 275), a garage on the same lot as the owner's dwelling apparently is within the curtilage (Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951), and a roomer in a rooming house can still claim the protection of the outer walls, doors and windows of the whole house. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191.

 Some encroachment upon the curtilage has been countenanced through intimations respecting interrupted search. Where officers have lacked sufficient information to obtain a search warrant and have trespassed far enough to obtain the necessary information for obtaining one, it has been indicated that they should have held further search in abeyance where it was practicable to do so while going for a search warrant. McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191; Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951. Where there had been a lawful arrest, a limited search without a search warrant incident to the arrest was permitted. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. Yet the limited search was so narrowly restricted as to be all but outlawed where it was practicable first to obtain a search warrant. Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663. A more recent decision, however, has put the emphasis where the Fourth Amendment puts it, namely, upon the reasonableness of what the officers have done, the court saying, "To the extent that Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled. The relevant test is not whether it is reasonable

to procure a search warrant, but whether the search was reasonable." United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 435.

This is the rule which the Court believes it must apply to the situation here. In view of the quoted language, which the Court regards as the heart of the decision, it is not of controlling importance whether the officers stationed themselves within fifty feet or within two or three feet of the fence, or whether they stood against the fence with their bodies partly over the top wire, while they watched the house of the defendant. Where reasonableness begins and ends, not where privacy begins and ends, is the test. The right of privacy is entitled to jealous protection. United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775. But occasion for emphasis in the matter of its evaluation pales a little when the owner of the right regards it so lightly as to allow criminals to enter his house unannounced in the night time and a felon to flee for refuge to the family bedroom. Constitutional rights even of the lawless may not indiscriminately be struck down, lest the recoil destroy all liberty. Yet consideration for the peace of society and preservation of orderly freedom discloses a certain discrimination of necessity. It would be unreasonable for officers to station themselves within a few feet of the dwelling of a respected and law-abiding citizen and spy upon him and his family during the night. The sense of what is reasonable, on the other hand, is not offended when officers of the law go at night to the vicinity of a dwelling in order to observe the illegal activities of known criminals.

In Agnello v. United States, 269 U.S. 20, at page 32, 46 S.Ct. 4, at page 6, 70 L.Ed. 145, 51 A.L.R. 409, the court said: "The protection of the Fourth Amendment extends to all equally,—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws." In the Agnello case officers, without search warrants stationed themselves near enough to the house of Stephen Alba, one of the defendants, to watch the criminal proceedings within through a window. If that encroachment upon the right of privacy was unreasonable, the court failed to so note, its comment being, "The legality of the arrests or of the searches and seizures made at the home of Alba is not questioned. Such searches and seizures naturally and usually appertain to and attend such arrests." 269 U.S. 30, 46 S.Ct. 5. In its consideration of the same case, the Circuit Court of Appeals (2 Cir., 290 F. 671) had applied the test of reasonableness, which the Supreme Court has returned to in United States v. Rabinowitz, supra. If a limited encroachment upon privacy is deemed not to be unreasonable where an officer has information that a crime is about to be committed by the person who claims the right of privacy, it is because the offender and not the officer has jeopardized the Constitutional safeguard. It is neither the court nor the law that distinguishes between the honest citizen and the criminal. It is the criminal himself who makes the distinction in fact, and by his criminality makes it inevitable in law.

■ Little need be said as to any lack of knowledge which the officers had as to the contents of the fruit jar cases. In the endless procession of revenue violations and prosecutions the common fruit jar has played a conspicuous role. It has come to be almost as symbolic of moonshining as the illicit still itself. When, therefore, one man asks another in circumstances such as the present, "How many cases do you want us to bring up?" and another replies, "Bring it all up," no experienced revenue officer would entertain a moment's doubt that "cases" and "it" referred to whiskey. If the officers in this instance had any doubts, the doubts were dispelled when one of the cases was dropped and some of its jars were broken, all of which occurred before there had been any arrest or any seizure. These officers had learned enough from an informer to justify their going upon the premises to make an investigation. They saw, heard and knew enough to justify their conclusion that a felony was being committed in their presence. They thereafter needed no warrants in order to make the arrests and seize the evidence of

crime. The Court sees nothing unreasonable in anything they did.

The motion to suppress the evidence accordingly should be overruled. Let the necessary order be prepared.