**UNITED STATES v. AMOIA.**

No. 5194–C.

United States District Court
W. D. New York.

June 1, 1950.

George L. Grobe, U. S. Attorney, of Buffalo, N. Y. (Michael J. McMorrow, Buffalo, N. Y., of counsel), for plaintiff.

John J. Carlo, of Buffalo, N. Y., for defendant.

KNIGHT, Chief Judge.

Plaintiff moves to vacate and set aside an order entered January 24, 1950, suppressing certain evidence.

A federal grand jury indicted defendant on three counts: (1) for having in his possession and under his control, on or about October 7, 1949, in Buffalo, N. Y., a "distilling apparatus set up, * * * not being registered as required by law, in violation of Section 2810(a), Title 26, U.S.C. [26 U.S.C.A. § 2810(a)]"; (2) for having "in his possession certain distilled spirits, the immediate containers thereof not having affixed thereto a stamp or stamps denoting the quantity of such distilled spirits contained therein evidencing the payment of all Internal Revenue taxes imposed thereon, in violation of Section 2803, Title 26, U.S.C. [26 U.S.C.A. § 2803]"; (3) for being engaged on said date "in the business of a distiller without giving notice in writing to the Collector of Internal Revenue of the district wherein such business was carried on, in violation of Section 2812, Title 26, U.S.C. [26 U.S.C.A. § 2812]."

The facts about this search and seizure are stated in the opinion of this court dated January 20, 1950. 91 F.Supp. 223.

The order in question, granted and entered January 24, 1950, provided:

"Ordered, that any and all evidence and knowledge obtained by virtue of the illegal search and seizure be set aside and suppressed, and that the United States District Attorney and the United States Internal Revenue Department, or any other branch thereof, are hereby restrained from making any use of the things seized, or of any information gained as a result of the said illegal search and seizure, and it is further

"Ordered, that the above entitled indictment No. 5194–C be quashed and held for naught, the evidence having been obtained by virtue of an illegal search and seizure."

Plaintiff, in support of its motion, has submitted these four supplemental affidavits:

T. W. Dreesen, an Investigator in Charge of the Alcohol Tax Unit of the

Bureau of Internal Revenue, who avers (affidavit verified January 24, 1950) that, on October 7, 1949, "he was at home when he received a telephone call from a member of the Liquor Squad of the Buffalo Police, who stated that they had seized a still on the premises of 568 Busti Avenue, Buffalo, New York, and requested that he assign an Investigator of the Alcohol Tax Unit to adopt this case from the Buffalo Police Department for prosecution in Federal Court; that he immediately contacted Criminal Investigator Rudolph L. Weidemann and told him to contact Criminal Investigator Taylor and that the two should proceed to 568 Busti Avenue and adopt the case from the Buffalo Police Department."

Rudolph L. Weidemann, said Criminal Investigator, in his affidavit of February 23, 1950, alleges that he wishes to supplement his affidavit of January 6, 1950, "by adding that when he received a telephone call from his superior, Mr. Dreesen, that Mr. Dreesen told him that Buffalo Police had seized a still at No. 568 Busti Avenue and that Mr. Dreesen further directed him to proceed to that address for the purpose of adopting the seizure from the Buffalo Police."

Lewis E. Newman, a Patrolman in the Buffalo Police Department, in his affidavit of February 24, 1950, supplementing that of January 9, 1950, alleges "that at the time he came upon said still in operation at said premises, he had no prior information of its existence or operation; he had not had instructions or conversation from any other officers, either local or Federal, relative to the still and upon finding the still, he took possession of it and remained on guard over it until he was relieved by other officers * * * that he did not remain upon the premises until Federal officers arrived and, in fact, did not, on that occasion, see any Federal officers arrive to adopt the seizure from Buffalo Police."

Irving W. Dehn, a Police Officer of Buffalo Police Department attached to Vice and Liquor Squad, in his affidavit of February 24, 1950, supplementing his affidavit of January 9, 1950, alleges "that from the time the still * * * was found by officers of the Buffalo Police Department * * * until the time when Federal agents were notified of its presence and came upon the premises * * * the still * * * was in the custody of Buffalo Police Department officers * * * that he had no prior knowledge of the existence of this still until it was found by Buffalo Police Officers * * * that he had no conversation or arrangements with any Federal agents relative to the existence or the seizure of said still. To the best of his knowledge, Federal agents had no knowledge of (its) existence * * * until he notified (them) to come and adopt the case from us."

Defendant has not submitted any opposing affidavit but his and plaintiff's counsel have submitted supplemental memoranda.

None of the officers involved in this case had a search warrant. The still was first discovered by said *Patrolman Newman* who "had no prior information of its existence or operation." In his affidavit of January 9, 1950, he said: "On or about the 7th day of October, 1949, I went to premises No. 568 Busti Avenue * * *, for the purpose of serving a notice upon the Amoia family regarding one of their children. I rang the bell at the side door, but received no response. The door was open. I thereupon stepped into the hallway and called, but again received no response. From the hallway there is a door with a stairway leading to the cellar, and I could see that a light was burning in the cellar, and I could also hear a washing machine in operation. I stepped down the cellar stairs and again called, but neither received any response nor saw anyone there. At the rear of the cellar I saw a separate room partitioned off from the rest of the cellar. There were various cracks in the partition itself and near the doorway through which I could see a light burning within. I walked to the rear * * * and I could see through the cracks * * * what appeared to me to be a still in operation. I then retraced my steps * * * and at the foot of the stairway I met * * * Mrs. Amoia. I then called into the house officer Davisson

who joined Mrs. Amoia and I in the cellar. Then, accompanied by (them), I again walked to the rear of the cellar where I removed an open padlock from a hasp on the door leading to the separate room. On opening the door I saw a still in operation. I then requested officer Davisson to telephone No. 10 Precinct, which he did. Shortly thereafter we were relieved by other officers and we left the premises * * *. Neither I nor officer Davisson at any time contacted any federal agents regarding the still."

No affidavit of officer Davisson has been submitted. Patrolman Newman does not mention defendant Joseph Amoia. Investigator Dreesen made no affidavit prior to that of January 24, 1950. Investigator Weidemann, in his affidavit of January 6, 1950, alleges that he received a telephone call from his superior, Investigator Dreesen, to proceed to 568 Busti Avenue, that he arrived there about 6:15 P.M. and "found there certain police officers of the City of Buffalo, among them Detectives Lehmann and Dehn, and saw in the basement * * * a certain still * * * proceeded to make certain routine investigation * * *; that at about 8:00 P.M. Joseph Amoia arrived * * * he asked (him), 'What have you got here?' and (he) answered, 'A still * * * I had 300 gallons of sour wine and I put sugar and water in it' * * * that shortly thereafter *he placed (him) under arrest* * * * *took from the premises certain samples of mash and alcohol,* and *that he destroyed the still upon the premises* * * *. that he had no knowledge of the finding of said still by Buffalo police officers prior to the time he received telephone instructions of his superior, Mr. Dreesen, and his arrival at the premises after 6:00 P.M."

██ Amendment IV of the U. S. Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

In Trupiano v. United States, 334 U.S. 699, 705, 68 S.Ct. 1229, 1232, 92 L.Ed. 1663, it is said: "It is a cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants wherever reasonably practicable." Plaintiff, however, urges that its seizure without warrant was lawful because "Federal courts need not look beyond Federal adoption of evidence arising out of state police search."

In two cases decided by Moscowitz, J. (D.C.E.D.N.Y.) in 1940, where the search and seizure by state police officers was illegal but was adopted by the federal government, a motion to suppress the evidence was denied. In United States v. Linderman, 32 F.Supp. 123, 124, he said: "An illegal search and seizure conducted by the State Police Officers without the knowledge, consent or approval of the Agents of the Alcohol Tax Unit but subsequently adopted by the Government does not prevent a criminal prosecution upon the evidence illegally seized. (Citing)

Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293, 52 A.L.R. 1381; In re Milburne, 2 Cir., 77 F.2d 310; Schroeder v. United States, 2 Cir., 7 F.2d 60; Rettich v. United States, 1 Cir., 84 F. 2d 118. I am bound by the decisions of the higher Courts. If I were approaching this question initially I should decide that, if State officers exceeded their authority and made an illegal search and seizure, the evidence obtained by the Police Officers should not be admissible for prosecution in Federal Court."

Quoting this language in United States v. Suttenberg, 35 F.Supp. 861, 862, he says: "It seems a sad commentary on justice where an illegal search is made upon an individual and his property seized as a result thereof, that such evidence should be admissible in a court of law, however, such is the decision of the courts which this court respectively accepts."

In the Gambino case, 275 U.S. 310, 48 S.Ct. 137, above cited, the court said: "On August 1, 1924, Gambino and Lima were arrested by two New York state troopers, near the Canadian border; their automobile (while occupied by Gambino and there-

fore within the protection accorded to his person) was searched without a warrant, and intoxicating liquor found therein was seized. They, the liquor and other property * * * were immediately turned over to a federal deputy collector of customs for prosecution in the federal court * * *. There the defendants were promptly indicted for conspiracy to import and transport liquor in violation of the National Prohibition Act [27 U.S.C.A.] They moved seasonably, in advance of the trial and again later, for the suppression of the liquor as evidence and for its return, on the ground that the arrest, the search, and the seizure were without a warrant and without probable cause, in violation of the Fourth, Fifth, and Sixth Amendments of the Federal Constitution. The motion was denied; the evidence was introduced at the trial; the defendants were found guilty; and they were sentenced to fine and imprisonment. The Circuit Court of Appeals affirmed the judgment." 275 U.S. at pages 312–313, 48 S.Ct. at page 137.

The court further said: "In the memorandum filed by the Governor approving the act which repealed the Mullan-Gage Law, he declared that all peace officers, thus including state troopers, are required to aid in the enforcement of the federal law 'with as much force and as much vigor as they would enforce any state law or local ordinance,' and that the repeal of the Mullan-Gage Law should make no difference in their action, except that thereafter the peace officers must take the offender to the federal court for prosecution. Aid so given was accepted and acted on by the federal officials. It appears that one of the troopers who made the arrest and seizure here in question had been stationed at the Canadian border for 18 months prior thereto, the greater part of that period being after the repeal of the Mullan-Gage Law. It was also shown that, immediately after the arrest and seizure, the defendants, their car, and the liquor were, after they had been taken to the committing magistrate, turned over to the federal officers. In view of these facts, the statement, in the affidavit of one of the troop-

ers, that at the time of the arrest and search. 'there were no federal officers present, and that we were not working in conjunction with federal officers,' must be taken to mean merely that the specific arrest and search was not directly participated in by any federal officer." 275 U.S. at pages 315–316, 48 S.Ct. at page 138.

The court unanimously reversed the conviction and said: "We are of opinion that the admission in evidence of the liquor wrongfully seized violated rights of the defendants guaranteed by the Fourth and Fifth Amendments. The wrongful arrest, search, and seizure were made solely on behalf of the United States. The evidence so secured was the foundation for the prosecution and supplied the only evidence of guilt. It is true that the troopers were not shown to have acted under the direction of the federal officials in making the arrest and seizure. But the rights guaranteed by the Fourth and Fifth Amendments may be invaded as effectively by such co-operation as by the state officers acting under direction of the federal officials." 275 U.S. at page 316, 48 S.Ct. at page 138.

In distinguishing its prior decisions, the court said: "The conclusion here reached is not in conflict with any of the earlier decisions of this court in which evidence wrongfully secured by persons other than federal officers has been held admissible in prosecutions for federal crimes. For in none of those cases did it appear that the search and seizure was made solely for the purpose of aiding the United States in the enforcement of its laws." 275 U.S. at page 317, 48 S.Ct. at page 139.

The three further cases cited by Moscowitz, J. in support of his ruling may be analyzed as follows:

In Schroeder v. United States, 2 Cir., 7 F.2d 60, a sergeant of police in New York City saw defendant carry a package from a building to an automobile and place it therein. He testified he took the package therefrom, "had it opened, and found that it contained six bottles of gin. He made no arrest at that time. On the following day, he took these bottles to the United States chemist in the Federal Building,

and reported the circumstances to the assistant United States attorney, whereupon an application for a warrant was made; the witness swearing to a complaint at that time. Under that warrant, the defendant was arrested. The witness accompanied the United States marshal when the warrant of arrest was served." 7 F.2d at pages 61–62. The first count of indictment charged defendant with unlawful possession, the second with transportation of intoxicating liquor. Conviction and sentence under the first count was set aside; that under the second count was affirmed. The court said: "The cases abundantly show that evidence obtained by state or municipal officers under an invalid search warrant, or without a warrant, may be used in a federal court in a criminal case under circumstances analogous to those in the case at bar." 7 F.2d at p. 63.

When this opinion was delivered, the Gambino case had not yet been decided.

In re Milburne, 2 Cir., 77 F.2d 310, involved a motion to suppress evidence by reason of an illegal search and seizure in New York City. It appears that state police officers had tapped the wires leading to a public toll telephone in Milburne's garage and had overheard conversation leading them to infer that whisky was being sold and delivered from the premises. On May 7, 1934, they went there without a search warrant and, in a room on second floor, found whisky and some incriminating papers, which they seized and subsequently turned over to agents of the United States. "This proceeding seeks to suppress use of the liquor and papers as evidence and to obtain return of them to the appellant." 77 F.2d page 310. In affirming the order of the lower court denying such application, the court said:

"The affidavits assert that the telephone wires were tapped pursuant to the affiants' duties as police officers, and there is nothing in the record to indicate that in entering the premises and conducting their search they were acting under any authority excepting such as they derived from the local law, or were seeking evidence solely of a federal crime. Compare Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137,

72 L.Ed. 293, 52 A.L.R. 1381. The state had an Alcohol Beverage Control Law * * * (Consol.Laws, c. 3-B), it is admitted that there were * * * 'possible violations' of it, and the statement in Officer Canavan's affidavit that some of the places, to which deliveries had been made according to the seized list, were not licensed to engage in a retail liquor business, indicates that the officers were directing their attention to state violations. It is true that after discovery of the whisky the officers placed Milburne under arrest on a federal charge, but this does not establish that the search and seizure were made solely on behalf of the federal government * * *. Since the appellant's motion was denied without prejudice to renewal upon the trial, he may upon renewal of the motion be able to show that the search was conducted solely on behalf of the federal government." 77 F.2d at pages 311–312.

In Rettich v. United States, 1 Cir., 84 F. 2d 118, Rettich and others were convicted of conspiracy and assault on a mail truck driver with a dangerous weapon, thereby effecting a robbery of registered mail. Conviction was affirmed. They contended "that the evidence of certain receptacles found buried in the Rettich lawn containing $10,000 in new bills and a bag of nickels, a part of the fruits of the robbery, was obtained on an illegal search warrant issued by the United States commissioner in violation of the Fourth and Fifth amendments to the United States Constitution, or by an illegal state search warrant issued to a state police officer, and any evidence obtained under either warrant was not competent on which a grand jury could find an indictment, or for the consideration of the traverse jury, and the trial judge erred in refusing to quash the indictments and in refusing to strike out the evidence relating to the finding of a metal box containing the bills and the tin box containing the nickels." 84 F.2d at pages 120–121.

The court held: "The state warrant was not issued at the instigation of any federal officer or agent. Lieut. Stenhouse, who was directing the digging when the money was found, testified that in applying for a

state warrant he received his orders from Superintendent Kelly of the Rhode Island State Police; that no postal officer advised or was present when it was obtained. [84 F.2d page 121] * * *. While it does not appear that the directions of the state warrant were complied with, since the goods seized were not returned to the court issuing the warrant, but were turned over to a postal inspector and kept in his custody, evidence secured even by an unlawful search and seizure by state officers, when not acting in behalf of the federal government, is admissible in a prosecution for a federal offense in the United States courts, whether seized under an invalid search warrant or without any warrant at all." 84 F.2d at page 122.

The court further said: "This case is distinguishable from the case of Gambino et al. v. United States, 275 U.S. 310, 318, 319, 48 S.Ct. 137, 72 L.Ed. 293, 52 A.L.R. 1381 * * *, where there was no state law, which the state officers could be enforcing at the time of the seizure * * *." 84 F.2d at page 122.

In its opinion of January 20, 1950, this court relied on Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, and cases there cited. Plaintiff now urges that it involved a totally different set of facts because in that case (1) only federal agents were involved in the search and seizure, (2) they had the still and its operators under closest surveillance for three weeks, (3) they had one of their own operatives working under cover with the still operators, (4) they had ample time and opportunity to obtain a search warrant.

In the later case of Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 1373, 93 L.Ed. 1819, a federal Secret Service Agent was notified by the Camden, New Jersey, police and the hotel manager that counterfeiting currency was apparently being carried on in a hotel room where petitioner and another were registered under assumed names. The Agent went there, looked through keyhole and reported to city police he saw no currency counterfeiting but was confident "something was going on." Suspecting that room occupants were counterfeiting race-track tickets, the city police obtained warrants for violations of a city ordinance, entered the room in occupants' absence, made a search and found evidence of currency counterfeiting. The Agent was not present when this took place but he arrived later, examined the evidence and was present when petitioner and his companion arrived and were arrested and searched by city police, who turned over to him the evidentiary articles. The court, with three justices dissenting, held "that the evidence on which the conviction rests was illicit and the motion to suppress it should have been granted." 338 U.S. at page 80, 69 S.Ct. at page 1375.

The court further said: "Had Greene (the federal Secret Service Agent) accompanied the city police to the hotel, his participation could not be open to question even though the door of Room 402 had not been opened by him. See Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 391, 82 L.Ed. 436, 468. To differentiate between participation from the beginning of an illegal search and joining it before it had run its course, would be to draw too fine a line in the application of the prohibition of the Fourth Amendment as interpreted in Byars v. United States, supra, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. The crux of that doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter." 338 U.S. at pages 78–79, 69 S.Ct. at page 1374.

In the instant case nothing was turned over to the federal authorities. The two city police officers went to the premises to serve a notice regarding one of defendant's children. Finding the door open, patrolman Newman went down into the cellar and discovered a still in operation. He then asked his fellow patrolman Davisson to telephone Precinct No. 10. The latter then apparently notified federal investigator Dreesen, who immediately contacted federal investigator Weidemann and he arrived at the premises about 6:15 P.M., destroyed the still, took "certain samples of mash and alcohol", and, when defendant

arrived about 8 P.M., put him under arrest.

The crimes charged in the three counts of the indictment were purely federal offenses and not punishable by the laws of New York. There was no emergency and a warrant could have been procured by investigator Weidemann. "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." McDonald v. United States, 335 U.S. 451, 460, 69 S.Ct. 191, 195, 93 L.Ed. 153. See the tabulated "Analysis of Decisions Involving Searches and Seizures" in Harris v. United States, 331 U.S. 145, 175–181, 67 S.Ct. 1098, 1121, 91 L.Ed. 1399.

For the reasons above stated, plaintiff's motion to vacate and set aside the order in this case entered January 24, 1950, suppressing certain evidence, is hereby denied.