**STATE of Missouri, Respondent,**

v.

**George SCHAFFER, Appellant.**

No. 48680.

Supreme Court of Missouri,
Division No. 2.

Feb. 12, 1962.

Motion for Rehearing or for Transfer
to Court en Banc Denied
March 12, 1962.

Allen J. Roth, St. Louis, for appellant.

Thomas F. Eagleton, Atty. Gen., George D. Chopin, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

LEEDY, Judge.

George Schaffer was found guilty by a jury of the offense of rape, and he appeals from the judgment sentencing him to imprisonment for a term of ninety-nine years as fixed by the trial judge under the Habitual Criminal Act (§ 556.280, RSMo and V.A.M.S.). He has not filed a brief, but his motion for a new trial (to which, in the absence of a brief on his part, we look for the assignments of error preserved for appellate review) raises, or attempts to raise, only three questions, viz.: (1) The sufficiency of the evidence to make a submissible case; (2) the admissibility of "State's Exhibit No. 4," a photograph of prosecutrix taken in color by a police photographer, and (3) the propriety of permitting the trial to proceed over defendant's objections to the demeanor of the prosecutrix at certain times while testifying.

The facts are bizarre and revolting, but enough of them must be stated to determine what seems to be the principal point in the case, and that is whether the court should have directed a verdict of not guilty as moved by defendant at the close of all the evidence.

The prosecutrix, who will sometimes be referred to as Patricia, is a mentally and physically retarded, 18-year-old, white girl. She lived with her parents and six or seven brothers and sisters in the 2600 block of Cass Avenue, a predominantly colored neighborhood in the City of St. Louis. The defendant lived about two blocks away—at 1521 North Jefferson. He is a Negro, formerly a boxer, having participated in more than three hundred fights,

and, as nearly as we are able to ascertain from the record, probably about 48 years of age.

On Thursday, April 21, 1960, about 3 or 3:30 p. m., Patricia's mother sent her to a neighborhood cleaning establishment (located just across the street from defendant's home) to pick up her father's pants. The pants were not ready, and she "started back home." Traveling the usual and normal route homeward would cause her to pass in front of 1521 North Jefferson. While walking along the sidewalk adjacent to those premises, she was grabbed from behind by defendant, and dragged into his house where, to use her language, she "got socked in the stomach and almost choked."

There is no dispute as to the following particular facts (both prosecutrix and defendant having testified to them): That prosecutrix remained in defendant's house or living quarters (comprised of four rooms—"all in line, one room after the other") until about 8 or 8:30 o'clock the next morning; that defendant "shaved" the pubic hair from the region of her groin (actually he used hair clippers with which he did barbering), and that they spent some part of the night in bed together, both in the nude.

Turning now to the state's proof in relation to other aspects of the offense, and what transpired after prosecutrix was dragged into the house, it is sufficient to say, without descending into particularities, that the state's evidence was such as to have warranted the jury in finding the facts to be substantially these: That defendant struck prosecutrix in the stomach and mouth with great force, choked her, threw her on a bed, and tore her clothing off; that he "knocked her out," and for some indefinite period she did not know anything; that she woke up during the night and tried to get out the back door, but was unsuccessful because intercepted by defendant, who had wakened, and he caused her to get back in the bed with him—both were naked; that during the

night defendant told her if she made "one sound" he would knock her brains out with a hammer; that she woke up after daylight and defendant permitted her to go about 8 a. m., after first warning her that he would kill her if she told anybody.

Prosecutrix was apparently unable to tell the jury from her own knowledge whether defendant had sexual intercourse with her, as will appear from these excerpts from her direct examination:

"Q. What happened after he threw you on the bed?

"A. He shaved me.

"Q. What happened to your clothing?

"A. He tore my clothing off me.
* * *

"Q. What happened after he threw you on the bed, Patricia?

"A. I don't know. * * * He knocked me out. * * *

"Q. Do you know what intercourse is?

"A. Yes.

"Q. Did this man have intercourse with you, do you know?

"A. Yes.

"Q. Do you know—do you remember it?

"A. No, I don't remember it."

When permitted to leave about 8 a. m., Patricia went directly to her home (two blocks away), arriving there in a nervous and frightened condition with bruises and scratches on her neck and body. She was taken at once to City Hospital to undergo medical examination, and there two vaginal smears for male sperm were made—one from the vulva, and the second from the deepest part of the vagina. The bacteriologist testified that the latter was positive—"Spermatozoa present." The exam-

ining physician at the hospital testified that at the time of the examination Patricia was emotionally upset; there were scratches on her neck and left arm, and she complained of pain in her chest, and she had an abrasion of her vulva. He further testified that "trace of spermatozoa" will remain in the female organ from twenty-four hours up to about forty-eight after an act of intercourse; and that, assuming the vaginal smear was positive (as subsequently testified to by the bacteriologist), it was his medical opinion that there had been penetration in this instance within the 24–48 hour period. Additionally, laboratory tests showed seminal fluid to be present on her undergarments.

On her way home from the hospital, Patricia pointed out to the police the premises where the assault had occurred, and about 11:15 that night the police there arrested defendant. When he opened the door, he said to the two policemen (both of whom he knew), "I know what you are here for. I really done it this time." When they stepped into the house to question him, "he stated he did have intercourse with the girl—that 'he had her,' and pointed out the room wherein it had occurred."

The state proved defendant had been priorly convicted of murder in the second degree, and sentenced to a term of ten years in the Missouri Penitentiary, from which he was discharged November 5, 1956, upon lawful compliance with said sentence. On cross-examination he admitted numerous other convictions, i. e., for fighting, carrying concealed weapons, common assault, assault with a deady weapon (brass knuckles) in Chicago in 1943, and possibly others about which he was not sure.

Defendant's version, in brief (and in addition to what has already been related as having been admitted by him), was this: That Patricia's presence in his house was entirely voluntary on her part; that she entered by the back door at 5:30 or 6 o'clock, ostensibly to see his former housekeeper, Gert, and to borrow money from the latter

with which to get clothes out of a cleaning shop; that he informed prosecutrix that Gert was not there, but nevertheless she did not want to go home, and he did not ask her to go because she was afraid her mother was going to whip her—this for the reason that her clothes were torn and she was "scratched and beat up"; that during the 15 or more hours she was in his home, she was "free to go" (although the doors were locked from the inside); that he slept most of the 15-hour period "after I finished drinking." This was the extent of his direct examination, it having been concluded without any denial of his guilt, but the following was developed on cross-examination:

"Q. Now, Schaffer, did you have intercourse with this girl?

"A. That I said over and over again, if anything like that occurred, I don't know anything about it, because I put the girl in the middle room, and when I woke up she was in mine, she was in my bed.

"Q. When you woke up were you undressed?

"A. Yes.

"Q. Were you completely nude?

"A. I was completely nude when I went to bed.

"Q. Is that the normal way you went to bed?

"A. I sleep that way * * *.

"Q. She was completely nude when you woke up?

"A. Yes.

"Q. Did you ever strike her, Schaffer?

"A. That I swear I didn't do.

"Q. Didn't you tell the police you were so drunk you didn't know what happened; didn't you tell the police

down there you were so drunk you didn't know what happened the whole night?

"A. I told the police that I had been drinking. They asked me what happened, he said—he asked me if I hit her, and I said I never hit her. * * *

"Q. You remember what happened now?

"A. No more than that I remembered then. * * *

"Q. Is it your testimony you did not have intercourse with this girl?

"A. I said if I did I didn't know nothing about it—I have no remembrance of it, or any knowledge of it.

"Q. You don't remember?

"A. I said then, and I still say, I don't remember having any intercourse with her, at all.

"Q. But you do remember that you did not strike her, is that right?

"A. I remember that.

"Q. You do remember you did not drag her in off the street, is that correct?

"A. That is definitely correct.

"Q. So you do remember you didn't strike her and you remember you didn't drag her in off the street?

"A. That's right.

"Q. But you don't remember whether you had intercourse with her?

"A. That's right.

"Q. Do you remember if you shaved her pubic hair down at her private parts?

"A. At her insistence.

"Q. She asked you to do that?

"A. She asked me to do that.

"Q. She asked you to do that?

"A. She asked me to do that so that she would have something to show her mother why she stayed out all night."

The following questions and answers appear in defendant's re-direct examination:

"Q. (By Mr. Roth) How many rooms in your house?

"A. Four.

"Q. Were they all in line, one with the other?

"A. Right.

"Q. Do you remember the prosecutrix getting up; that is, Pat—getting up in the middle of the night, at any time?

"A. If I remember correctly I told her—she woke up during the night—I woke up, see, I didn't know she was in bed with me; I had originally told her to go to bed in the middle room—I had two bedrooms, and the bedroom between my room and the front room was the bed she was originally put in to go to sleep."

■ The motion for new trial assigns error in the court's failure to direct a verdict of not guilty in these respects (to quote the motion): "[T]hat the circumstantial evidence of semen found in the vagina * * * did not tend to prove the act of penetration by said defendant, and further, that there was no evidence of force being used by said defendant at any time shortly before the time alleged by the state for the commission of the alleged act, and further, any testimony about force earlier was not sufficiently connected to the time of the alleged commission of the alleged act." Taking these seriatim: No extended discussion is required to demonstrate that under the admitted fact of wide-open opportunity for (and in the light of defendant's mild disclaimer, if not to say

tacit admission, of) intercourse between the principals within permissible time limits for effective smear test purposes, it was for the jury to say whether the defendant was responsible for the positive reaction of the smear test for male sperm as made upon prosecutrix, and, in consequence, penetration. The second and third reasons assigned are overlapping and to some extent contradictory in that they seem to admit or imply that defendant had used force at some early stage of prosecutrix's detention, but that it was too remote because not "shortly before" the act constituting the offense was "alleged" to have been committed, nor was it otherwise sufficiently connected in point of time. The proof did not show the precise time at which the act occurred—whether when prosecutrix was first dragged in, or later. The uninterrupted presence of the parties together for 15 to 18 hours, under the conditions we have noted, when considered in the light of the retarded mentality of prosecutrix, her testimony as to having been struck, beaten and choked, and her physical condition upon being released, made the question of defendant's use of force a question for the jury. The motion for a directed verdict was properly ruled.

■ Error is assigned in receiving in evidence, over defendant's objection, a color photograph made of prosecutrix on the morning of April 22 by the police. The motion charges that it depicts her as being "horribly injured with discoloration and bruises about her neck and face." The objection interposed at the trial was that it was inflammatory, highly prejudicial, and if introduced for the purpose of showing injuries, it was beyond the scope of the indictment, counsel meanwhile interjecting this conclusion, "I am sure that the color of it is not the coloring that would be natural." The photograph was properly identified as representing how Patricia looked on the morning of April 22. It is not before us for inspection because not included in the transcript,

nor filed here separately. The matter involved is largely one of discretion which is entrusted to the trial court. There is nothing in the record to indicate an abuse of that discretion. In the absence of the photograph itself, and in view of the only medical evidence in the case (that of the examining physician at City Hospital, a state's witness) that the scratches around prosecutrix's neck and left arm were superficial, we defer to the superior opportunity of the trial court to evaluate the probable effect of the tendered exhibit as being inflammatory or not, and, doing so, unhesitatingly overrule this assignment.

■ The next and final assignment is somewhat akin to the foregoing one in that it, too, challenges a discretionary ruling. The charge is that the court should have declared a mistrial in each of several instances because of prosecutrix giving testimony while in a highly emotional state, "sobbing hysterically, tearfully crying, and unable to testify without interrupting herself by her aforesaid sobbing and crying." We find two instances where defendant moved for a mistrial, once on the ground that the prosecutrix was "sniveling," and another (one page later in the transcript) that she was "crying and sniveling on the stand" and "on the verge of hysteria." In the first instance, the court commented and ruled, "The witness is conducting herself very properly in the court's opinion, the objection is overruled." In the second, the court stated that in its opinion the witness was not hysterical, but "conducting herself here fairly well—she is conducting herself properly, while she is stumbling a little bit, but that is the ordinary thing that happens in rape cases—that is the way girls in rape cases do—they do it all the time. Your objection is overruled." There is nothing in the record to indicate the situation was otherwise than as stated by the court, and no prejudice appears therefrom. No evidence was heard on the motion for a new trial, and the grounds thereof directed to this particular matter, being mere conclusions, do not prove them-

selves. Defendant's contention is disallowed.

We have examined those portions of the record where on Rule 28.02, V.A.M.R. requires that judgment be rendered whether error is assigned or not, and find the same sufficient. The judgment is, accordingly, affirmed.

All of the Judges concur.