260 A.2d 716.

STATE *vs.* DOUGLAS G. BROWN.

JANUARY 14, 1970.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

454

ROBERTS, C. J. This is an indictment charging that the defendant and others on June 18, 1964, in the town of North Kingstown, "* * * did have in their possession implements adapted and designed for cutting thru, forcing, breaking open and entering a building, room, vault, safe, and other depository, in order to steal money and other property therefrom, * * * knowing the same to be adapted and designed for the purpose aforesaid, with intent to cut thru, force, break open and enter a building, room, vault, safe and other depository in order to steal money and other property therefrom." This defendant waived jury trial on the indictment, and the cause was tried to a justice of the Superior Court sitting without a jury, who found the defendant guilty. The defendant is now in this court prosecuting a bill of exceptions.

The evidence discloses that, at about 10:20 p.m. on the

night of June 18, 1964, Patrolman William J. Glover of the North Kingstown police, while patrolling along Post Road in a southerly direction, observed a red Ford convertible, occupied only by a driver, turn into a driveway which led to a building known as the Lebeau Block and occupied in part as an office by one George A. Lebeau. The patrolman, who testified that he was familiar with the area and the motor vehicles usually seen there, did not recognize the red Ford convertible. As that car proceeded into the driveway, he saw the lights extinguished, and at that the patrolman decided to return to the scene and investigate.

As he turned his car about and went back to the driveway, he saw the red convertible, now occupied by four persons, backing out into the highway. He overtook the red Ford on Post Road and stopped it. At that point, the driver alighted from that vehicle and directly approached the patrolman at the police car, presenting his operator's license and registration. The patrolman examined the operator's license and registration and then walked toward the red Ford for the purpose of making a closer examination. He then observed that three persons had remained inside the car, one of them being the defendant here.

Upon looking into the car, he testified without contradiction, he saw a "duffel bag" that appeared to be filled with some objects and "sitting on top of the duffel bag" was a "pry bar." He further noticed that on the floor at the back seat a check-writing machine was partially visible. He then turned to go back to the police car, and at that point the three persons who had remained in the red Ford alighted, joined the driver, and started to advance toward him in a group. He then, grasping the butt of his service pistol, ordered all four back to the red Ford, and called for assistance.

After a brief interval, two more North Kingstown police officers arrived to assist Patrolman Glover. They then

briefly interrogated the occupants of the Ford about the articles observed therein. They denied knowing each other, although the officers observed that they were calling each other by first names. After an interval of about five minutes, the police officers decided to continue their investigation at the police station. They arrived at the station about 10:45 p.m., and at 10:50 p.m. the Chief of Police, who had been called, arrived at the station. At this time all four occupants of the car were in the police station and, according to the testimony of the Chief of Police, were seated in a guard room, so called. The chief, about 10 minutes after arriving, started out to look at the Ford parked in the station yard.

As he approached the Ford, he was informed by a police clerk that a break at Lebeau's office had been reported. The chief testified that at that time he was about halfway across the station yard to examine the car and that he continued over to the car. He testified that he looked through the window and saw the duffel bag lying on the back seat and that he also saw a checkwriter. He further testified that on the front seat there were two pairs of gloves, one yellow and one black. He then opened the right-hand door of the car, took out the duffel bag, and, seeing some object projecting from underneath the driver's seat, picked it up and found that it was a walkie-talkie radio. He further testified that he took the checkwriter from the back seat and at that time observed a pry bar lying on the floor of the rear seat of the car. This he also took.

We shall consider first defendant's contention that the court erred in denying his motion to suppress certain evidence, particularly the duffel bag, the pry bar, and the gloves, as having been seized illegally and in violation of his constitutional right to be secure against unreasonable search and seizure. Article IV of amendments to the Con-

stitution of the United States. In our opinion, this contention has merit. It is clear from the record that the entire transaction here may be viewed as consisting of two phases. In the first phase defendant was taken into custody by Patrolman Glover at the time the police officer was approached by the occupants of the red Ford and had compelled them to re-enter the car and remain there. With the arrival of fellow police officers, the red Ford and its occupants were taken to the North Kingstown police station. At the time that Patrolman Glover compelled the accused and his companions to return to the car, he had already observed the duffel bag and the pry bar resting on the rear seat of the car.

Whatever might be said about the Rhode Island detention statute, it is our opinion that an arrest occurred at this time, for which arrest there was probable cause. Patrolman Glover had observed the travel of the Ford into the driveway, the extinguishment of its lights, and, when it was again seen backing out of the driveway, he noted that it had picked up three extra occupants while in the driveway. It cannot be doubted that the subsequent taking of the men into custody and removing them to the North Kingstown police station constituted a valid arrest. In *Brinegar* v. *United States*, 338 U. S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, the court, referring to probable cause for an arrest, said that, in substance, probable cause may be defined as a reasonable ground for a belief of guilt. It exists, according to that case, where the facts and circumstances within the knowledge of the officers and of which they had reasonably trustworthy information suffice in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed. There seems to be no question in the instant case that Patrolman Glover had probable cause to make the arrest. See also *State* v. *Mercurio*, 96 R. I. 464, 194 A.2d 574.

The fourth amendment prohibits unreasonable searches and seizures. "The Fourth Amendment was designed to protect both the innocent and the guilty from unreasonable intrusions upon their right of privacy while leaving adequate room for the necessary processes of law enforcement. The people of the United States insisted on writing the Fourth Amendment into the Constitution because sad experience had taught them that the right to search and seize should not be left to the mere discretion of the police, but should as a matter of principle be subjected to the requirement of previous judicial sanction wherever possible. * * * Such a requirement partakes of the very essence of the orderly and effective administration of the law." *Trupiano* v. *United States,* 334 U. S. 699, 709, 68 S.Ct. 1229, 1234, 92 L.Ed. 1663, 1671.

In that same case the Supreme Court stated what, in our opinion, is the fundamental rule concerning searches and seizures and the necessity for obtaining a warrant therefor. The Court said: "It is a cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants wherever reasonably practicable." *Id.,* at 705, 68 S.Ct. at 1232, 92 L.Ed. at 1669. The basic rule has been restated in *Terry* v. *Ohio,* 392 U. S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905: "* * * the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure * * *." In *Chimel* v. *California,* 395 U. S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, the test of practicability was again affirmed as being the fundamental test in whether or not a warrantless search may be justified.

The fundamental rule, then, is clear. It is that no warrantless search is legal unless at the time it was impracticable to procure a search warrant. However, exceptions are made to this rule when the situations are such as to disclose that in the circumstances it would be impracticable

to obtain a search warrant. These situations, in which it is clear that the requirements of law enforcement outweigh the right to privacy, are generally stated as (1) a search incidental to a lawful arrest, (2) a search made after unequivocal consent is freely given, and (3) a search made after a seizure authorized by law.

It is settled that, where a warrantless arrest is made with probable cause, a contemporaneous search may be justified. Searches incident to an arrest are permitted only if the circumstances surrounding the arrest require expeditious police action that cannot await the obtaining of a warrant. In *Preston* v. *United States,* 376 U. S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777, 780, the Court said: "The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control."

We are persuaded that the patrolman's observance of the pry bar while holding defendant and others, awaiting the arrival of assistance, would have justified a search at that time as being contemporaneous with an arrest of defendant. *Preston* v. *United States, supra,* does not preclude such a search of a motor vehicle in the circumstances. In that case the Supreme Court held that the search of a motor vehicle was not incidental to a lawful arrest when the search, as conducted, was remote as to time or place, saying: "Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." 376 U. S. at 367, 84 S.Ct. at 883, 11 L.Ed.2d at 780. It seems obvious that a search of the red Ford made at the time of the arrival of assistance would

have been justified and certainly would not have been remote either as to time or place under the *Preston* rule.

While the search was not made at that time, the court is impelled at this point to commend Patrolman Glover for his following what the court conceives would be sound and efficient police procedure. It is obvious that, with four men who had made a threatening approach to the patrolman and re-entered the car at his order, he would have been foolhardy, to say the least, to have attempted to search the car. To so do would have certainly required him to leave at least some members of the quartet under a rather loose surveillance while he made such a search and would have thereby risked attack on him and escape on the part of the accused. As we understand it, the patrolman elected to keep the car and its occupants under close surveillance until assistance arrived and at that time to take the quartet into custody and remove them to a more secure place, a move that we feel was in the public interest.

However, with the arrest and removal of the accused and his companions to the police station, this case entered into its second phase. The accused and his companions were then taken into the police station and held in the guard room, so called. The chief of the department had been called, and he arrived about 30 minutes after Patrolman Glover had first stopped the Ford. That vehicle was now parked in the yard of the police station. When the chief arrived at the station shortly after the accused had been brought in, the accused and his companions were under arrest beyond doubt.

About this time the chief was informed by a police clerk that a patrolman making an investigation had found that an entry had been forced in the premises used by Lebeau as his office. The chief then crossed the yard of the station and searched the Ford. At this time the question naturally arose whether the search made by the chief and the seizure

of the pry bar and other articles fell within the ban of *Preston* as being too remote from the arrest either as to time or place. It is our opinion that we need not rest our decision on that issue, for in all the circumstances the controlling issue is whether it was impracticable for the police to obtain a warrant for such a search.

It is clear from the record that the accused and his companions were under arrest and in custody in the police station, and that the car from which the articles subsequently were seized was parked in the station yard under police custody and control. We perceive nothing in the record that would have precluded the police from obtaining a search warrant to enter the car, seize those things in plain sight, and search it for other articles that might be used in evidence. The fact is that they had every opportunity to do that without any possibility of an assault being made upon them or the evidence being lost or destroyed. It is our opinion, then, that the search of the car at the police station in North Kingstown violated the constitutional right of this accused to be secure from unreasonable search and seizure as provided in the fourth amendment.[1]

Because we take the view that it was error to deny the motion to suppress the evidence in the instant case and that the search and seizure were illegal, it is not necessary for us to consider the other points raised by the defendant.

[1]Neither *Cooper* v. *California*, 386 U. S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730, which permits a "search" of a legally impounded vehicle, nor the "plain view" doctrine referred to in *Harris* v. *United States*, 390 U. S. 234, 88 S.Ct. 992 19 L.Ed.2d 1067, validates the seizure of the evidence taken from defendant's automobile. Here nothing in the record indicates that the vehicle was legally impounded; and the chief who went to the station yard to "look at the car" obviously intended to discover incriminating materials rather than to protect the vehicle or its contents. This is not a case where, incidental to the performance of other duties, an officer discovers evidence in plain sight. See *United States* v. *Bourassa*, 411 F.2d 69 (10th Cir. 1969); *Creighton* v. *United States*, 406 F.2d 651 (D. C. Cir. 1968); *State* v. *Evans*, (Iowa) 169 N.W.2d 200 (1969); *Segers* v. *Alabama*, 283 Ala. 694, 220 So.2d 882.

462

The exception of the defendant is sustained; the judgment appealed from is reversed, and the cause is remanded to the Superior Court for a new trial forthwith.

*Herbert F. DeSimone,* Attorney General, *Donald P. Ryan,* Assistant Attorney General, *Luc R. LaBrosse,* Special Assistant Attorney General, for plaintiff.

*Aram K. Berberian,* for defendant.