**363 A.2d 207.**

STATE *vs.* JOSEPH BENOIT and JULIAN ZIOBROWSKI.

AUGUST 20, 1976.

PRESENT: Paolino, Acting C. J., Joslin, Kelleher and Doris, JJ.

JOSLIN, J. The defendants were convicted by a Superior Court jury of assault with a dangerous weapon, an abominable and detestable crime against nature, kidnapping, rape and robbery. On appeal they argue that their trial was deficient in no less than nineteen different respects.

The complaining witness testified that while walking to her home in Providence late on the night of June 20, 1973, she was accosted by two men who forced her to enter their automobile, drove to Cranston, and over a period of several hours assaulted her, robbed her of her money, and against her will forced her to remove her clothing and to participate in various sexual acts with each of them. When she was finally allowed to leave the vehicle to attend to personal needs, she stated that, despite her nudity, she ran away and flagged a passing police patrol car. According to the two officers in that car, she was nude and hysterical, and related that she had just been raped by two men dressed in "white uniforms similar to orderly

uniforms." The officers radioed details of the incident to headquarters and a few minutes later another policeman, Officer Simmons, having heard the report, saw an automobile on Cranston Street with two occupants, each of whom appeared to be attired in white clothing such as that described in the intercepted radio report. He pulled alongside the automobile when it stopped at an intersection and ordered the occupants to get out of their vehicle. As they alighted, he observed a ladies' pocketbook on the front seat, a shoe on the floor of the passenger side, and a pair of panties on the rear seat.

Meanwhile, the two officers who had found the prosecutrix were on the way to police headquarters when they learned on the police radio of defendants' apprehension. They then drove to the scene to assist Officer Simmons. When they arrived the prosecutrix, who had been lying down on the back seat in accordance with their instructions, sat up and, upon seeing defendants, shouted, "That's them. That's them." Thereafter, she was taken to St. Joseph's Hospital and examined by a doctor and a nurse.

In the meantime defendants were taken to the police station and their car towed there. About 4 hours later, the pocketbook, shoe and panties earlier observed in defendants' auto while still on the open highway were removed by police officers without the benefit of a search warrant, as were several other articles then noticed, including items of ladies' wear, cosmetics, jewelry and the like. All of these items were identified by the prosecutrix as hers.

## THE MOTION TO SUPPRESS

The principal error assigned by defendants is that the taking of these articles from their automobile in the manner described violated their rights under the fourteenth amendment to the Federal Constitution and that consequently it was error to deny their motion to suppress that

evidence. To support that contention they argue initially that "[t]his search of this vehicle four hours after the arrest was not only not incidental to the arrest and therefore required a search warrant under any set of circumstances, but also was not incidental to a lawful arrest since the Defendants were not given their Miranda rights and their right to counsel at the time that the arrest took place."

This argument not only demonstrates a misconception of the law relative to the *Miranda* warnings, but also completely ignores the distinction between a warrantless search that acquires legitimacy because incident to a lawful arrest and one that is valid under the so-called "automobile exception" to the warrant requirement. The latter draws nothing from the principles justifying the former, but instead obtains its validity because of the

> "* * * necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, *where it is not practicable to secure a warrant* because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Carroll* v. *United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L. Ed. 543, 551 (1925). (Emphasis added.)

The exception was first enunciated in *Carroll* v. *United States, supra,* and, as since applied by the Supreme Court, permits a warrantless search of an automobile if there is probable cause to believe that its contents offend against the law, *id.* at 158-59, 45 S.Ct. at 287, 69 L.Ed. at 554, and if the attendant circumstances are exigent because the delay incident to obtaining a warrant would create a potential for the vehicle to be moved or its illegal contents disturbed. *Coolidge* v. *New Hampshire,* 403 U.S. 443, 460, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564, 579 (1971).

The facts in this case clearly bring it within the *Carroll* and *Coolidge* guidelines. The defendants' vehicle had

first been observed by Officer Simmons in the darkness of the early morning hours on an open highway in the vicinity where the reported crimes had occurred, its occupants were clad in the manner described by the prosecutrix; the prosecutrix had been found nude on the highway; various articles of feminine apparel had been observed in defendants' car; upon her arrival at the scene of defendants' arrest, the prosecutrix had identified them as the perpetrators of the alleged offenses; and the police had no prior opportunity to obtain a search warrant and indeed were unaware of any reason to have done so. In short, the probable cause factors, the unforeseeable circumstances attendant at the place where defendants and their automobile were taken into custody, and the then "fleeting" opportunity to search the car justified a warrantless search and seizure.[1]

But the fourth amendment intrusion here, unlike that in *Carroll* v. *United States, supra,* was not made when defendants were first stopped and their automobile was on the open highway, but was instead delayed until after the car had been towed to the police station where it was apparently immobilized and kept under police control and surveillance for about 4 hours. That time span certainly seems ample to have enabled the police to obtain a warrant, to have negated the exigency of an imminent removal of the car or its contents, to have repudiated any reason for believing that the opportunity to search was

---

[1]The factual circumstances prevailing in this case obviously differ substantially from those in *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), where exigency was negated and a warrantless search and seizure consequently constitutionally impermissible. In that case the police seized the defendant's automobile while it was in his driveway rather than on a public highway; they had known for several weeks of its probable role in the crime for which the defendant was apprehended, and indeed they had already obtained a search warrant for it.

"fleeting," and to have dissipated any justification for a warrantless search. Nonetheless, on comparable facts the Supreme Court held that the same circumstances that permit the police to conduct a contemporaneous warrantless search of an automobile on the open highway also authorize them to do so later at the station house. *Chambers* v. *Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 429 (1970); *accord, Texas* v. *White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975).[2]

While that holding, particularly when viewed in the light of some of the Court's language,[3] seems debatable, the rationale for the apparent inconsistency between holding and language was advanced a year later in *Coolidge* v. *New Hampshire, supra,* at 463 n.20, 91 S.Ct. at 2036 n.20, 29 L.Ed.2d at 581 n.20: "* * * *given* a justified initial intrusion, there is little difference between a search on the open highway and a later search at the station."

The defendants, however, rely on *State* v. *Brown*, 106 R. I. 453, 458, 260 A.2d 716, 719 (1970), where this court articulated the "fundamental rule" that under the fourth

---

[2]While the recital of the facts in the *Chambers* case does not clearly indicate the time elapsing between the stopping of the car on the highway and the subsequent search at the police station, the Court in *Coolidge* v. *New Hampshire,* 403 U.S. 443, 463 n.20, 91 S.Ct. 2022, 2036 n.20, 29 L.Ed.2d 564, 581 n.20 (1971), filled the void when it said that "* * * the actual search of the automobile in *Chambers* was made at the police station *many hours* after the car had been stopped on the highway * * *." (Emphasis added.)

[3]At one point the Court in *Chambers* says that "* * * if an effective search is to be made at any time, either the search must be made *immediately without a warrant* or the car itself must be seized and held without a warrant *for whatever period is necessary to obtain a warrant for the search,"* *Chambers* v. *Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428 (1970) (Emphasis added.), and at another point that "* * * there is little to choose in terms of practical consequences between an *immediate search* without a warrant and *the car's immobilization until a warrant is obtained."* (Emphasis added.) *Id.* at 52, 90 S.Ct. at 1981, 26 L.Ed.2d at 429.

amendment to the Federal Constitution "* * * no warrantless search is legal unless at the time it was impracticable to procure a search warrant." They argue that under the principle enunicated in *Brown,* the seizure in this case was unconstitutional inasmuch as the police could have obtained a warrant in the 4-hour interval between the time defendants and their automobile were taken into custody and the time the articles sought to be suppressed were seized. But the *Brown* case antedated *Chambers* v. *Maroney, supra,* and while our reliance in that case on the rule of practicability is understandable in the light of prior Supreme Court decisions,[4] once *Chambers* was decided, we, although certainly free to interpret our own constitutional search and seizure provision more restrictively than the fourth amendment, were powerless to impose requirements of either lesser or greater stringency as a matter of federal constitutional law than had been established by the United States Supreme Court. *Oregon* v. *Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 576 (1975). Consequently, the reaffirmation of the *Brown* rule of practicability in *State* v. *Maloney,* 111 R.I. 133, 140, 300 A.2d 259, 263 (1973), a case which postdates but does not cite *Chambers* v. *Maroney, supra,* has no persuasive effect at least as to federal constitutional law, which is the only law upon which defendants relied.

---

[4]Thus, for example, the Supreme Court said in *Terry* v. *Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968), that "* * * the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure * * *"; and a year later quoted the foregoing passage with approval in *Chimel* v. *California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685, 693 (1969).

For the reasons indicated we find no error in the trial justice's denial of the motion to suppress.[5]

## THE IN-COURT IDENTIFICATION

During direct examination the prosecutrix testified that part of her clothing had been removed. When the prosecutor asked by whom, she replied, "Mr. Ziobrowski, the dark-haired fellow right there." This was her first reference to either defendant by name, she having previously spoken only of the "dark-haired" or "light-haired" man. Counsel for defendants promptly requested a voir dire hearing to ascertain whether the in-court identification was "free from taint." That request was granted and at the hearing which followed the prosecutrix testified that she had seen defendants during the alleged attack, when they were first apprehended; at a prior hearing; and during the present trial. The trial justice found nothing in that testimony to preclude her from making an in-court identification.

The defendants' principal objection, as we understand it, is that the prosecution should not have been permitted to supplement the prosecutrix's in-court identification with testimony about her spontaneous recognition of defendants when she rose from the back seat of the police car. This recognition, say defendants, constituted a pretrial extrajudicial identification at which they were denied their constitutional rights to counsel and due process. They further argue that the admission of this testimony was so prejudicial that it mandates automatic reversal and is incapable of salvage by proof that the courtroom identifica-

[5]While the trial justice relied principally upon the plain view doctrine as justifying the subsequent seizure of the car's contents, in the frame of reference of this case we refrain from extending the relaxation of the practicability rule beyond the point where the Supreme Court stopped in *Chambers* v. *Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Consequently, our conclusion is premised squarely on the automobile exception.

cation had an independent source, which they in any event claim did not exist.

In support of this contention defendants rely on *State* v. *Ragonesi,* 112 R. I. 340, 309 A.2d 851 (1973), where we considered the so-called "lineup" cases: *Simmons* v. *United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States* v. *Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert* v. *California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and *Stovall* v. *Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The defendants emphasize *Ragonesi's* discussion of the problems presented when the prosecution, as a part of its direct case, seeks to bolster an in-court identification with testimony of a pretrial extrajudicial identification at which an accused was denied the right to counsel or due process. To admit such testimony in those circumstances, according to *Ragonesi,* "* * * will constitute error which, unless rendered harmless by application of the *Chapman-Harrington* escape valve, will require automatic reversal. And finally the rule provides that proof that the courtroom identification had an independent source will not obviate the necessity for reversal." *State* v. *Ragonesi, supra* at 343, 309 A.2d at 853.

But here the state did not attempt as a part of its direct case to support the prosecutrix's in-court identification of defendants by a prior extrajudicial identification. True, there was evidence of a prior identification, but the testimony with regard to it was evoked not as a part of the state's direct case, but rather during the evidentiary hearing that was requested by defendants and was conducted outside the presence of the jury. Indeed, as far as this record indicates, the prosecution intended to offer no more than a courtroom identification, and in that circumstance a defense challenge to admissibility calls for the trial justice

"\* \* \* on facts elicited outside the presence of the jury, [to] rule upon whether a pre-trial identification by the same eyewitness is violative of due process or the right to counsel. If a violation is found, the court should then decide whether the in-court identification is still admissible because it has an independent source \* \* \*." *Id.* at 344 n.4, 309 A.2d at 854 n.4, *quoting Clemons* v. *United States,* 408 F.2d 1230, 1237 (D. C. Cir. 1968), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

Under these guidelines, the question posed by defendants' contention first narrows to whether the prosecutrix's spontaneous pretrial identification of defendants was violative of their constitutional rights. The defendants' insistence notwithstanding, we are hard pressed to understand how *Ragonesi* or the cases cited therein are in any sense dispositive of this situation where the prosecutrix, *in contravention of prior police instructions,* rose from a prone position and identified the men then being placed under arrest. Certainly, this was neither a lineup nor a showup in the sense in which those terms are commonly understood, and defendants have failed to cite any authority which holds that a comparable pretrial identification deprives an accused of his right to counsel or due process. But even if this were a constitutionally deficient identification, it nonetheless seems clear that the several hours during which the prosecutrix was held captive and sexually assaulted by defendants provided a more than adequate independent source for her subsequent in-court identification.

Finally, defendants also contend that the voir dire hearing for the ascertainment of a possible constitutional violation should have preceded the prosecutrix's in-court identification. While that contention might in certain circumstances have merit, it certainly has none in a case such as this where our conclusion is that the pretrial out-of-court identification in no way tainted the courtroom identification.

## EMOTIONAL OUTBURSTS

The defendants also argue that the prosecutrix's conduct on the witness stand was so highly emotional that it prevented them from effectively cross-examining her, made a fair and impartial trial impossible, and consequently called for favorable action on their several motions for a mistrial. To deny those motions, they contend, was error.

It is, of course, true that there are cases where a witness' displays of emotion are so frequent and so intense that they produce such passion and prejudice as to justify taking a case from the jury. But whether or not they produce that result is a matter which under established case law rests largely in a trial justice's sound judicial discretion, and, except in an instance where that discretion is clearly shown to have been abused, his refusal to grant a mistrial because of a complaining witness' outbursts, outcries and the like will not be disturbed. *Commonwealth* v. *Dies*, 248 Mass. 482, 487-88, 143 N. E. 506, 508-09 (1924); *State* v. *Cox*, 172 Minn. 226, 228, 215 N.W. 189, 190 (1927); *State* v. *Schaffer*, 354 S.W.2d 829, 833-34 (Mo. 1962); *State* v. *Gill*, 243 Ore. 621, 622, 415 P.2d 166, 167 (1966); Annot., 46 A.L.R.2d 949 (1956).

In denying defendants' motions for a mistrial in this case the trial justice in effect held that the prosecutrix's emotional outbursts in the light of all the circumstances seemed to him to be inevitable, and he also specifically stated his satisfaction that the prosecutrix's conduct had not interfered with an effective cross-examination. The defendants refer to nothing in the record that would justify our concluding that in so finding he abused his discretion.

## GRAND JURY MINUTES

The defendants also contend that the trial justice erred in denying their motion to inspect the grand jury minutes of the prosecutrix's testimony. Success on that motion

was dependent on defendants' establishing at the trial level a "particularized need" for those minutes, that is, for example, by adducing evidence that would satisfy the trial justice "* * * that extraneous circumstances provide[d] reasonable grounds for belief that the testimony of the witness might be vulnerable to impeachment on cross-examination by reason of potential inconsistencies that might be disclosed upon an adequate inspection of the minutes by the defendants' counsel." *State* v. *Ouimette,* 110 R. I. 747, 763, 298 A.2d 124, 134 (1972); *accord, State* v. *Crescenzo,* 114 R. I. 242, 253-54, 332 A.2d 421, 428 (1975); *State* v. *Palmigiano,* 112 R. I. 348, 360-61, 309 A.2d 855, 862-63 (1973).

On appeal defendants point to no record evidence suggesting that at trial they established a "particularized need" for the requested inspection, but instead simply advance vague assertions that they required the grand jury testimony for a "proper evaluation" of "possible exculpatory evidence." Those assertions fall far short of persuading us that the trial justice abused his discretion in denying their motion.

## NEWLY DISCOVERED EVIDENCE

Nancy M. Aneyci, the emergency room nurse at St. Joseph's Hospital on duty when the prosecutrix was brought there on the night of the alleged incident, testified generally about the prosecutrix's then physical and emotional condition and concerning the medical examination she received from an attending physician.

About 4 months following the jury's guilty verdicts, defendants moved for a new trial on the ground that had their recently acquired knowledge that Nurse Aneyci was an active member and representative of the Rhode Island Rape Crisis Committee been available at the trial, they would have been able to question her about her personal con-

victions and feelings regarding sex offenses of the kind charged. They further contend that if those convictions and feelings had been conveyed to the jury, they would not only have had an impeaching effect on the nurse's testimony, but probably would also have resulted in not guilty verdicts.

The controlling guidelines for granting new trials on the ground of newly discovered evidence are set out in *State* v. *Carsetti,* 111 R.I. 642, 650-51, 306 A.2d 166, 171 (1973). We said there that evidence, even if otherwise qualifying as newly discovered, will not be new trial entitling if merely impeaching or cumulative or if of such a nature as would not in all probability change the verdict at a new trial.

In this case the trial justice found that the newly discovered evidence, "even viewed in the very worst light," would be no more than impeaching. In addition, and following an extensive review of much of the material evidence pointing to defendants' guilt, he further found that there was "absolutely no question" in his mind that "* * * presentation of testimony to this jury of Mrs. Aneyci's connection with the Rape Crisis [Committee] would produce no different result." Then, based on those findings, he denied defendants' motion. The defendants have not met their burden of establishing that in so concluding the trial justice was clearly wrong or that he overlooked or misconceived material evidence on this issue, and consequently we will not disturb his denial of their motion.

## REMAINING ASSIGNMENTS OF ERROR

The defendants' remaining assignments of error require little or no discussion. Some are of instances where despite the trial justice's substantial compliance with their specific requests, defendants nonetheless baldly insist that his compliance was insufficient to insure that their right

to a fair trial was not impaired. One example is defendants' contention that they were prejudiced by the trial justice's repeatedly requesting, sua sponte, that certain so-called "inflammatory" testimony by the prosecutrix be read back by the court stenographer. But at defendants' request, the trial justice cautioned the jury that the only reasons for the repetition were his inability to hear the witness' answers and his concern that the jury might also be experiencing a slight difficulty. Another example is defendants' complaint of a residual deleterious effect of the "literally dozens" of leading questions asked by the prosecutor to which their objections were generally sustained.

The rest of the defendants' assignments of error are manifestly without any basis whatsoever in law. Some are to discretionary rulings where patently there has been no abuse of discretion shown; others are unsupported either by argument or citation of authority and hence under Sup. Ct. R. 16 not deserving of consideration; and, finally, even if in any instance there was error, it was clearly harmless.

The defendants' appeals are denied and dismissed, and the judgments of conviction appealed from are affirmed.

Motion to reargue denied without prejudice.

*Julius C. Michaelson,* Attorney General, *Judith Romney Wegner,* Special Asst. Attorney General, for plaintiff.

*Bernard C. Gladstone,* for Joseph Benoit, *William F. Reilly,* Public Defender, for Julian Ziobrowski, defendants.