Grafton
No. 2010-313

THE STATE OF NEW HAMPSHIRE

v.

CHRISTOPHER S. GUAY

Argued: June 15, 2011
Opinion Issued: September 20, 2011

*Michael A. Delaney*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Dorothy E. Graham*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. After a jury trial in Superior Court (*Vaughan*, J.), the defendant, Christopher S. Guay, was convicted of three counts of aggravated felonious sexual assault (AFSA), *see* RSA 632-A:2 (Supp. 2010), and one count of felonious sexual assault (FSA), *see* RSA 632-A:3, III (2007 & Supp. 2010). On appeal, he argues that the trial court erred by: (1) failing to grant his request for a mistrial; (2) failing to dismiss one of the three AFSA counts; and (3) denying him access to all of the victim's medical and counseling records. We affirm in part, reverse in part, and remand.

## I. Facts

The jury could have found the following facts. The victim, J.G., born on October 15, 1997, is the biological daughter of the defendant and K.G. After the defendant and K.G. divorced in March 2002, J.G. spent every other weekend and Wednesdays with the defendant. The defendant remarried in 2004 to H., who had one son, J.T., from a prior marriage to Jason T. The defendant and H. had a daughter, J. The defendant and H. separated in March or April 2008.

During the defendant's marriage to H., he and Jason T. became friends. Over the weekend of April 25-27, 2008, the defendant and Jason T. took an overnight trip to Lincoln with the victim, J.G., and the other two children. The hotel room in which the group stayed consisted of a downstairs area, with a kitchen, bathroom, and pull-out bed, and a loft area with a single bed and a set of bunk beds. The loft area was not visible from the downstairs portion of the room.

On the evening of April 25, J.G. put her half-sister, J., to bed in one of the loft bunks and then got into the single bed in the loft to watch television. The defendant, Jason T., and his son, J.T., were in the downstairs area, and the defendant and Jason T. were drinking beer. At some point, the defendant went up into the loft and told his daughter, J.G., to go to bed. J.G. later awoke to feel the defendant touching her vagina. The defendant also touched J.G.'s breasts that night, and told her not to tell her mother what he had done because he would go to jail.

On the following night, April 26, J.G. again slept in the single loft bed. She awoke to find the defendant on top of her. J.G. realized that her pants had been removed and that the defendant's fingers were in her vagina. The defendant then put his penis in J.G.'s vagina and moved his body "up and down." Jason T., who had been sleeping in the downstairs area with J.T., was awakened in the night by the sound of J.G. "apologizing" to the

defendant in the loft and asking the defendant if he was mad at her. Jason T. heard the defendant respond to J.G., "No, why would I be mad?"

Shortly after the assault on the night of April 26, J.G. noted that the bed had "wet stuff all over it," and that some of it was also on her body. J.G. put her pants on, went to the bathroom, and saw that she was bleeding. Jason T. saw J.G. as she came out of the bathroom and remarked that her pants were on inside out. J.G. eventually disclosed the assaults to her best friend and then to her mother, K.G., who called the police. The defendant was later charged with three counts of AFSA and two counts of FSA.

Prior to trial, the defendant requested that the State produce J.G.'s medical and counseling records. The State objected in part, but agreed that the court could review the requested records *in camera* and determine which records should be released to counsel. After reviewing the records, the trial court issued an order releasing some of them to counsel, but concluding that the remainder should not be disclosed.

At trial, the defendant testified in his own defense. During the defendant's testimony, immediately after he stated that listening to J.G.'s accusations against him was "heartbreaking," J.G. shouted out from the back of the courtroom, "You're such a freakin' liar." The trial court denied the defendant's request for a mistrial but twice issued curative instructions to the jury. The jury found the defendant guilty on all three counts of AFSA and one count of FSA. This appeal followed.

## II. Denial of Mistrial Request

The defendant first argues that the trial court erred when it denied his request for a mistrial following J.G.'s emotional outburst in the courtroom during his testimony.

"Mistrial is the proper remedy only if the evidence or comment complained of was not merely improper, but also so prejudicial that it constituted an irreparable injustice that cannot be cured by jury instructions." *State v. Neeper*, 160 N.H. 11, 15 (2010) (quotation omitted). When reviewing a trial court's ruling on a motion for a mistrial, we "recognize that the trial court is in the best position to gauge the prejudicial nature of the conduct at issue and has broad discretion to decide whether a mistrial is appropriate. We will not overturn the trial court's decision on whether a mistrial or other remedial action is necessary absent an unsustainable exercise of discretion." *State v. Ainsworth*, 151 N.H. 691, 698 (2005).

Here, the defendant argues that J.G.'s outburst "exposed the jury to inadmissible information that she did not, and could not, present during her direct examination" — namely, that the defendant was a liar. The defendant further argues that the outburst "overshadowed" the impact of his testi-

mony, "infuse[d] sympathy" for J.G. and "hostility" for him, and that, consequently, no instruction could have cured the prejudice that the outburst caused to his case. We disagree.

In light of the testimony given by both J.G. and the defendant prior to J.G.'s outburst, we are not persuaded that the "inadmissible evidence" presented by the outburst required the trial court to declare a mistrial. The jury heard J.G. testify that the defendant committed the charged sexual assaults and also heard the defendant deny the charges. Given the conflicting testimony, it could hardly have been a surprise to the jury that the victim did not believe the defendant to be testifying truthfully. Moreover, credibility issues are within the jury's province, and it could reasonably have concluded that the defendant lied during his testimony. Under these circumstances, we do not conclude that J.G.'s outburst, reflecting her opinion of the defendant's credibility, was so prejudicial that it was incurable.

Further, although J.G.'s outburst could have appealed to the jury's sympathies, the trial court immediately instructed the jury to ignore it, and then dismissed the jury from the courtroom. After the jury returned to the courtroom, the trial court issued a second instruction in which it stated that the jury was "required to decide this case from the facts in evidence and the testimony under oath of the witnesses." Additionally, the trial court asked the jury collectively whether J.G.'s outburst would "affect [anyone's] ability to impartially decide this case," to which not one juror responded affirmatively.

Jurors are presumed to follow the court's instructions. *See State v. Cosme*, 157 N.H. 40, 46 (2008).

> It is, of course, true that there are cases where a witness' displays of emotion are so frequent and so intense that they produce such passion and prejudice as to justify taking a case from the jury. But whether or not they produce that result is a matter which under established case law rests largely in a trial justice's sound judicial discretion, and, except in an instance where that discretion is clearly shown to have been abused, his refusal to grant a mistrial because of a complaining witness' outbursts, outcries and the like will not be disturbed.

*State v. Benoit*, 363 A.2d 207, 213 (R.I. 1976); *see also Com. v. Melendez-Rodriguez*, 856 A.2d 1278, 1287 (Pa. 2004) (upholding trial court's denial of a motion for mistrial where "victim's outburst did not add anything new to her version of the events that she had previously testified to upon direct examination"); *Clegg v. State*, 655 P.2d 1240, 1241-44 (Wyo. 1982) (upholding

trial court's denial of a motion for mistrial based in part on its determination that the "outburst could redound against the victim and have the effect of discrediting her in the eyes of the jury").

Based upon the record, we conclude that the trial court sustainably exercised its discretion by declining to declare a mistrial after J.G.'s outburst.

*III. Sufficiency of the Evidence*

The defendant next argues that the trial court erred when, at the close of the State's case, it denied his motion to dismiss for insufficient evidence of penetration regarding the AFSA charge that alleged digital penetration during the first night at the hotel.

As a threshold matter, the State contends the defendant failed to preserve this issue for appeal. A motion to dismiss must state the specific ground on which it is based in order to preserve the issue for appeal. *State v. Dodds*, 159 N.H. 239, 243-44 (2009) (concluding that where motion to dismiss for insufficiency of the evidence was "couched in general terms" and did not specify that it was based on statutory interpretation, the defendant failed to preserve the issue for appeal). Here, when the defendant moved to dismiss the subject AFSA charge at the close of the State's case, he argued that there was insufficient evidence of his guilt because J.G.'s testimony was "inconsistent," not that the State had failed to prove digital penetration. Accordingly, we conclude the defendant failed to preserve this issue for appeal.

Because the defendant failed to preserve the issue, we conduct a plain error analysis of his argument on appeal. Under the plain error rule, we may consider errors not raised before the trial court. *State v. Matey*, 153 N.H. 263, 266 (2006); *see* SUP. CT. R. 16-A. "However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." *State v. Russell*, 159 N.H. 475, 489 (2009) (quotation omitted). To find plain error: "(1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* We have looked to federal plain error analysis in applying our plain error rule. *Id.* at 489-90.

We note first that the State has raised a question as to whether the transcript accurately reflects J.G.'s testimony at trial regarding this charge. At trial, the prosecutor asked J.G., "And where was he touching you?" The original transcription of J.G.'s response was "on my vagina." However, the State moved to correct the record and submitted a correction from a certified transcriptionist indicating that J.G.'s answer to this

question was actually "my vagina," and not "*on* my vagina." The defendant responded to the State's motion by indicating that "whether this Court interprets the words from the record to be 'on my vagina' or 'my vagina' does not significantly alter [his] argument on appeal." Assuming, as the State contends, that J.G.'s answer was "my vagina," for the following reasons we conclude that it was plain error for the trial court not to have dismissed the charge for insufficient evidence of digital penetration.

■ Turning to the first prong of the plain error test — that there was error — we review the evidence to determine whether it was, as the defendant contends, insufficient to prove penetration. We conclude that the evidence was insufficient. Our standard for review in this area is well established:

> To prevail in a challenge to the sufficiency of the evidence, the defendant bears the burden of proving that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt. In reviewing the evidence, we examine each evidentiary item in the context of all the evidence, not in isolation. Circumstantial evidence may be sufficient to support a finding of guilty beyond a reasonable doubt. Further, the trier may draw reasonable inferences from facts proved and also inferences from facts found as a result of other inferences, provided they can be reasonably drawn therefrom.

*State v. Young*, 159 N.H. 332, 338 (2009) (quotation omitted).

Pursuant to RSA 632-A:2, I(*l*), (Supp. 2010), a person is guilty of the crime of aggravated felonious sexual assault if such person engages in sexual penetration with another person when the victim is less than thirteen years of age. "Sexual penetration" is defined as "[a]ny intrusion, however slight, of any part of the actor's body, including emissions, or any object manipulated by the actor into genital or anal openings of the victim's body." RSA 632-A:1, V(a)(5) (Supp. 2010).

In this case, J.G.'s testimony concerning the assault on the first night at the hotel was sufficient only to establish that the defendant touched her vagina, but not to establish that he penetrated her vagina with his fingers. J.G.'s testimony about this incident was as follows:

Q: What woke you up?

A: Him touching me.

Q: And where was he touching you?

A: My lower place.

Q: And what is your lower place?

A: My vagina.

Q: And what did you have on for clothes at that point?

A: Just PJ pants and a shirt.

Q: And when you woke up you said he was doing what?

A: Touching me.

Q: And where was he touching you?

A: My vagina.

After testifying that the defendant also touched her breasts that night, J.G. testified that she rolled over and went to sleep and "[t]hat's all that happened."

The State argues that the response "my vagina" to the question "where was he touching you," is sufficient to establish, by reasonable inference, that the defendant penetrated J.G.'s vagina with his fingers. In support of this contention, the State relies upon the reasoning in *State v. Flynn*, 151 N.H. 378, 384-85 (2004), and *People v. Hillier*, 910 N.E.2d 181 (Ill. App. Ct. 2009), as well as our statutory definition of "genital openings."

We conclude that the State's reliance upon *Flynn* and *Hillier* is misplaced, as both are distinguishable. In *Flynn*, we determined there was sufficient evidence of digital penetration even where the victim gave conflicting testimony concerning the assault. The victim in *Flynn* "awoke because of an uncomfortable feeling in her genital area" and found she was "on her back with her knees tilted sideways, separated by the defendant's right hand." *Flynn*, 151 N.H. at 380. At trial the victim testified that she felt pain in her genital area, but alternately described the pain as occurring "in [her] vagina," and then during cross-examination, "like a scratch on the outside of her vagina." *Id.* at 384 (brackets omitted). There was ample circumstantial evidence, however, from which a jury could have reasonably inferred that penetration occurred. The defendant's own version of events corroborated the victim's testimony that she felt his finger upon her, the victim testified that the sensation she felt occurred close to the time the defendant ejaculated, and a single sperm, belonging to the defendant, was found inside the victim's vagina. *Id.* at 381. Further, we noted that the victim's conflicting testimony did not negate the evidence tending to establish penetration and concluded that "through examination of all the facts and circumstances of this case," one could rationally conclude that the defendant used his finger to intrude, however slightly, into the victim's vagina, thereby establishing sexual penetration. *Id.* at 385.

■ Here, the evidence of sexual contact on the first night in the hotel was limited to J.G.'s testimony that the defendant touched her vagina. J.G. testified that she was wearing "PJ pants" and there was no testimony that

her pants were removed during the incident or that the defendant's hands were underneath her clothing. This stands in contrast to J.G.'s later testimony concerning the assault occurring the next night. As to that assault, she testified that her pants were removed prior to the assault, that the defendant placed his fingers "in" her vagina, and that he placed his penis in her vagina. Thus, J.G. was obviously capable of testifying to sexual penetration. Under these circumstances, we cannot conclude that her testimony was sufficient to establish, beyond a reasonable doubt, that the defendant penetrated her with his fingers during the first incident.

Nor do we find *Hillier* supportive of the State's position. In *Hillier*, a challenge to the sufficiency of the evidence was unsuccessful where the defendant was charged with sexual assault and the victim's testimony, in response to the prosecutor's question "where did [the defendant] place his finger," was "my vagina." *Hillier*, 910 N.E.2d at 183-85. In concluding that this response was sufficient to prove penetration, the *Hillier* court relied on its own case law establishing that a jury may reasonably infer penetration where the defendant "rubbed, felt or handled the victim's vagina," and that "[s]uch an inference is unreasonable only if the victim denies that penetration occurred." *Id.* at 184 (quotations omitted) (citing *People v. Bell*, 600 N.E.2d 902, 906-07 (Ill. App. Ct. 1992)). Here, there was no evidence that would support a reasonable inference that penetration occurred. Moreover, we decline to adopt a general rule establishing an inference of penetration except where the victim expressly denies penetration. To do so would arguably effect an impermissible shifting of the burden onto the defendant to disprove the charged act. It is the State's burden to prove the defendant's guilt beyond a reasonable doubt. N.H. CONST. pt. 1, art. 15. Accordingly, we decline to rely upon the reasoning in *Hillier*.

Finally, we address the State's argument based on statutory interpretation. RSA 632-A:1, I-b defines the term "genital openings" as "the internal or external genitalia including, but not limited to, the vagina, labia majora, labia minora, vulva, urethra or perineum." The State appears to argue that because the vagina is statutorily defined as a "genital opening," penetration may be proven by testimony which asserts only that a defendant touched this body part.

The interpretation of a statute is a question of law, which we review *de novo*. *State v. Kousounadis*, 159 N.H. 413, 423 (2009). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *State v. Thiel*, 160 N.H. 462, 465 (2010). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Id.*

■ Although "vagina" is defined by the statute as a "genital opening," that definition does not establish that touching the vagina constitutes penetration. On the contrary, the statute defines penetration as *"intrusion . . . into* genital or anal openings of the victim's body." RSA 632-A:1, V(a)(5) (emphases added). Thus, the State was required to prove digital intrusion into J.G.'s vagina. To interpret the statute as urged by the State would, in effect, eliminate from the statute the definition of "penetration."

■ Our next consideration is whether the error was plain. "Plain is synonymous with clear or, equivalently, obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993) (quotations omitted). We conclude that the error here was plain. As discussed above, the evidence was insufficient to establish sexual penetration, an element of the charged crime, as defined by statute. *See* RSA 632-A:2. Under these circumstances, the State could not have met its burden of proof and the charge should not have been submitted to the jury.

■ As to the third prong of the plain error test, we conclude that the error affected the defendant's substantial rights because the trial court's failure to dismiss the charge at the close of the evidence led to his conviction on the charge. *See State v. Lopez*, 156 N.H. 416, 425 (2007) ("[T]o satisfy the burden of demonstrating that an error affected substantial rights, the defendant must demonstrate that the error was prejudicial, *i.e.*, that it affected the outcome of the proceeding.").

Finally, because the defendant was convicted based upon insufficient evidence of guilt, to allow the defendant's conviction to stand would seriously affect the fairness and integrity of judicial proceedings. The defendant's conviction on this charge is, accordingly, reversed.

*IV. Request for In Camera Review of Records*

■ Finally, the defendant requests that we conduct an *in camera* review of the confidential records reviewed *in camera* by the trial court. For the trial court to conduct an *in camera* review of the victim's confidential records, the defendant must first show a reasonable probability that the records contain information that is material and relevant to his stated defense. *State v. Sargent*, 148 N.H. 571, 573 (2002) (quotation and citation omitted). This "threshold showing . . . is not unduly high." *Id.* It only requires the defendant to "meaningfully articulate how the information sought is relevant and material to his defense." *Id.* "At a minimum, a defendant must present some specific concern, based on more than bare conjecture, that, in reasonable probability, will be explained by the information sought." *Id.* If the defendant makes this showing, then the trial

court must review the requested information *in camera* to see if the file actually contains information that is "essential and reasonably necessary to the defense at trial." *Id.*

Here, after the trial court conducted its *in camera* review, it ordered disclosure of those portions of the records that it deemed were essential and reasonably necessary to the defense. Those portions of the records that the trial court deemed not to be essential and reasonably necessary to the defense remained sealed by the trial court and were not disclosed to counsel. The defendant now argues that the trial court may have erred in determining that the sealed records were not subject to disclosure.

We review a trial court's decisions on the management of discovery and the admissibility of evidence under an unsustainable exercise of discretion standard. *State v. Amirault*, 149 N.H. 541, 543-44 (2003). To meet this standard, a defendant must demonstrate that the trial court's rulings were clearly untenable or unreasonable to the prejudice of his case. *Id.*

After review of all the records reviewed by the trial court, we do not conclude that the trial court unsustainably exercised its discretion in determining which of the victim's confidential records would not be disclosed. *See Sargent*, 148 N.H. at 574. Accordingly, we find no error in the trial court's disclosure order.

> *Affirmed in part; reversed in part; and remanded.*

DALIANIS, C.J., and DUGGAN and HICKS, JJ., concurred; LYNN, J., concurred specially.

LYNN, J., concurring specially. I join fully in the majority's thoughtful opinion in this case. I write separately, however, to address an issue that has troubled me for some time, that being our repeated use of the phrase "essential and reasonably necessary" as the standard for determining whether otherwise privileged materials, such as counseling records of the alleged crime victim, must be disclosed to the defense for use at trial.

We first used the phrase to describe the standard for disclosure of privileged materials to a criminal defendant in *State v. Farrow*, 116 N.H. 731, 733 (1976). In *Farrow*, we were "faced with the question whether[, and the extent to which,] the defendant's sixth amendment right to confrontation entitle[d] him to have access to and to use information which falls within the scope of [doctor/psychologist patient] privileges for the purpose of cross-examination and impeachment." *Farrow*, 116 N.H. at 733. After rejecting the proposition that the United States Supreme Court's opinion in *Davis v. Alaska*, 415 U.S. 308 (1974), gave the criminal defendant "a right to the blanket use of privileged information," we held that

> the defendant's right is limited to the use of such materials as are found to be *essential and reasonably necessary to permit counsel adequately to cross-examine for the purpose of showing unreliability or bias*. To prevent abuse and to protect the witnesses from unnecessary embarrassment the trial court should examine with counsel the records and other materials in question and determine what parts, if any, the defendant will be permitted to use.

*Id.* (emphasis added); *see State v. Thresher*, 122 N.H. 63, 72 (1982) (holding that trial court properly refused to permit disclosure of privileged communications, in part, because "use of the privileged information was not essential to the defense"); *State v. Kupchun*, 117 N.H. 412, 415 (1977) (citing *Farrow* when stating "the [physician/psychologist patient] privileges are not absolute and must yield when disclosure of the information concerned is considered essential").

In *State v. Gagne*, 136 N.H. 101, 104 (1992), we set forth the two distinct, yet intertwined, issues involved when a defendant desires to obtain privileged information: how the defendant can obtain *in camera* review by the trial court, and access to the information for use at trial. It is with regard to the second issue that we ascribed the "essential and reasonably necessary" standard developed in *Farrow*. *See Gagne*, 136 N.H. at 104. We have since repeated the phrase "essential and reasonably necessary to the defense at trial" more or less routinely in numerous cases involving a defense request for another's privileged or confidential materials, including today's decision. *See, e.g., State v. Eaton*, 162 N.H. 190, 195 (2011); *State v. Sargent*, 148 N.H. 571, 573 (2002); *State v. McLellan*, 146 N.H. 108, 113 (2001); *State v. Hoag*, 145 N.H. 47, 50 (2000); *State v. Graham*, 142 N.H. 357, 364 (1997). However, we have never elaborated upon or explained what this phrase means, perhaps because post-*Gagne*, the cases before us that related to a criminal defendant's ability to access another's privileged or confidential materials, by and large, involved the trial court's decision to deny a defense request for *in camera* review, rather than a decision on the disclosure of the information for defense use at trial.[1] *But see Sargent*, 148 N.H. at 573-74.

Most recently, in *Petition of State of New Hampshire (State v. MacDonald)*, 162 N.H. 64, 70 (2011), we held that the trial court erred by granting the State and the defense access to the alleged victim's medical and mental health records, without first conducting an *in camera* review to

---

[1] In addition to the above cited cases, *see generally State v. Gaffney*, 147 N.H. 550 (2002); *State v. Pandolfi*, 145 N.H. 508 (2000); *State v. Puzzanghera*, 140 N.H. 105 (1995); *State v. Locke*, 139 N.H. 741 (1995); *State v. Taylor*, 139 N.H. 96 (1994).

ascertain what, if any, records should be disclosed. While we referred to the burden of the party seeking disclosure to establish an "essential need" for the information contained in the privileged records, *see id.* ("essential need" relates to whether the targeted information is unavailable from another source and whether a compelling justification exists for disclosure), it is not clear whether we intended this language to describe a burden the same as, or in some way different from, the "essential and reasonably necessary" standard recited in *Farrow* and its progeny.

Today, I focus only on my linguistic concerns about the phrase "essential and reasonably necessary to the defense at trial." An ordinary understanding of "essential" includes "necessary," "important in the highest degree," and "something necessary, indispensable, or unavoidable." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 777 (unabridged ed. 2002). Thus, if certain information is "essential" to a criminal defendant's defense, then it is, by common understanding, "necessary" to the defense. If this were all there was to it, I could ignore the needless use of duplicative words as a minor annoyance, perhaps attributable to the chronic affliction of lawyers (who later become judges) for frequently indulging their impulse to use multiple words when one word will do.[2]

But when the word "reasonably" is thrown into the mix, the problem becomes more substantive, for this word modifies "necessary" in a way that gives it a more expansive meaning than "essential." Hence, while all information that is "essential" to the defense is also "reasonably necessary" to the defense, the converse is not true: there may be some information that is "*reasonably* necessary" to the defense that falls short of being "essential" to the defense.

I would be open to considering adoption of either standard (essential or reasonably necessary) as the one that should govern this issue, or to distinguishing the meaning and application of each term, "essential" and "reasonably necessary," if that is appropriate. The critical point, in my view, is that we should adopt a *clear standard* for the guidance of defendants, lawyers and trial judges. Because this issue is not raised in the present case, the court's opinion understandably does not address it. However, I believe this is an area of the law that merits clarification as soon as the issue is presented in an appropriate case.

---

[2] I do not profess to be immune from this affliction.